RANSOME, and another, Plaintiffs-Appellants, v. WISCONSIN ELECTRIC POWER COMPANY, Defendant-Respondent.†

Supreme Court

*No. 76–301. Argued January 29, 1979.—Decided February 27, 1979.*
(Also reported in 275 N.W.2d 641.)

† Motion for reconsideration denied, with $50 costs, on May 1, 1979.

607

608

For the appellants there was a brief and oral argument by *Scott V. Lowry* of Waukesha.

For the respondent there was a brief by *William P. Croke* and *Prosser, Wiedabach & Quale, S.C.,* of Milwaukee, and oral argument by *Mr. Croke.*

BEILFUSS, C. J. In 1974 the plaintiffs-appellants, Ralph and Dorothy Ransome, owned a two-family rental house in the Town of Waukesha, Waukesha county. The defendant-respondent, Wisconsin Electric Power Company, furnished the electricity used in the house. The electricity supplied by the defendant was the customary residential voltage of 120–240.

The electricity was transmitted over the defendant's lines to a pole located near the plaintiffs' house and then through a transformer attached to the pole. In normal operations the voltage is reduced at this transformer from 4800 volts to 120–240 volts. The electricity at this reduced voltage goes over a line to the electric meter located at the house and after the electricity is metered it goes into the electrical system of the house. All of the transmission lines and equipment up to and including the meter are owned by and supervised by the defendant electric company.

The evidence established that approximately four days before September 28th lightning struck the transmission line near the transformer. On September 28th the pole transformer exploded allowing 1000–4000 volts of electricity to pass through the meter and into plaintiffs' house. This overload of electricity was the cause of the fire and resulting damage.

The plaintiffs commenced this products liability action contending that at the time the electricity left the defendant company's control it was unreasonably dangerous. The defendant denied the electricity was unreasonably dangerous when it left its control and affirmatively alleged that a lightning strike was an Act of God and a superseding intervening cause of the fire damage. By way of argument, the defendant contends that it should

be relieved of any liability because of policy considerations.

The following historical facts appear in the record:

Approximately 100,000 distribution transformers of the type which figured in the incident at issue here are located within the Wisconsin Electric Power Company's present system.

To the best of defendant's knowledge there have been no other cases where a fire or other damage has occurred to a residence as a result of the failure or malfunction of a residential line distribution transformer.

The last date prior to September 28, 1974, on which the wire and equipment of pole #31–4155 were inspected was December 14, 1973.

Ordinarily, electricity leaves the control of the Wisconsin Electric Power Company at the point in the distribution system where a customer's conductors are connected to the company's conductors, namely, at the electric meter.

The electric meter installed at the electricity service entrance of a residence belongs to the Wisconsin Electric Power Company which is responsible for its maintenance and repair.

The "sale" of electricity takes place at the meter where charges are generally computed.

While there probably are numerous technical definitions of "electricity," we need not be concerned with those accurate descriptions here—suffice it to say it is a form of energy that can be made or produced by men, confined, controlled, transmitted and distributed to be used as an energy source for heat, power and light and is distributed in the stream of commerce. The distribution might well be a service, but the electricity itself, in the contemplation of the ordinary user, is a consumable product.

Expert witnesses testified concerning the probable sequence of events at the utility pole in question and at the electricity service entrance to the house at the time of and just prior to the fire. Dr. George Steber, professor of electrical engineering and consultant for many companies in the Milwaukee area regarding high voltage design, appeared for the plaintiffs. Mr. James Mc-Cowen, superintendent of the distribution operation division of the Wisconsin Electric Power Company, and John Karlman, troubleman for the company, testified for the defendant.

Dr. Steber explained that the method of transmitting electricity over long distance at high voltage and reducing it by means of a transformer before it entered a residence was an economical and convenient way of distributing electricity. In Wisconsin it is the primary mode of transmission of electricity. Furthermore, the pole transformer used to reduce the line voltage from 4800 volts to 120–240 volts was a standard utility installation used throughout Wisconsin and was certainly within all accepted engineering practices.

The witnesses gave an explanation of the functioning of the pole transformer, a summary of which is as follows: The electrical power right outside the main generating plant is stepped up either to 130,000 or 145,000 volts. This is later stepped down to 26,000 or 13,000 volts, and finally to 4800 volts after the electricity has been distributed to the appropriate substations. Electricity is transmitted along the primary lines at 4800 volts until it reaches a step-down transformer where it is reduced to 120–240 volts. It then passes over the secondary lines and is distributed to individual buildings. A primary fuse is inserted in series with the high voltage wire that is connected to the transformer for the purpose of protecting the line. Two primary connections leading from the upper crossarm of the pole to the transformer provide the power into the trans-

former. Three conductors coming out provide the 120–240 volt service to the house. The inside of the transformer is basically a steel or iron core with several sets of copper wires wrapped around. Electricity going through the coil will transform from the 4800 volts going in to 120–240 volts coming out. The wires wound on the core are physically insulated from the tank and from the secondary conductors by means of an oil insulation. The installation is also equipment with a lightning arrester installed to drain to ground as quickly as possible most of the excess energy—which may be in the vicinity of hundreds of thousands of volts—produced by a lightning strike.

The above description describes the general engineering design of the installation. However, it does not reflect the actual condition of the components prior to the accident. John Karlman, the troubleman dispatched to the scene on the night of the fire, examined the pole transformer. His summary of the probable condition of the components prior to the fire was not contested. The electrical insulator on the top of the cross bar was missing. The primary fuse was broken. Part was lying on the cross bar in several pieces; part was hanging down below the primary crossarm. With the damage to the insulator, the primary wire was free and resting directly on the cross bar. McCowen testified that in itself it is not harmful as long as the surface of the crossarm remains dry, since wood—when dry—is a relatively good insulator. In addition, the lightning arrester was spent. It was found broken in at least two pieces with the ends dangling. Thus, the device was incapable of interrupting any additional lightning surges.

Based on the condition in which Mr. Karlman found the equipment on the utility pole, on the loud noise heard during the rain storm four days earlier in the area of the utility pole, and on the simultaneous momentary power outage which occurred in both the Ransomes and

neighboring house, Mr. McCowen was able to conclude that the damage done to the lightning arrester, the insulator and the primary fuse was probably the result of a lightning strike several days before the fire. Mr. McCowen testified that it is not frequent, but neither is it uncommon to have porcelain insulators damaged by a relatively close lightning strike. When this happens the porcelain will crack due to the intense heat, and either fall to the ground immediately or some time later due to the action of the wind vibrating the wires. Dr. Steber agreed that the insulator pin could have been damaged by lightning. However, he noted that in fact these devices can be broken and removed for a variety of reasons, for example, someone shooting at it with a rifle.

With the above summary of the general design of the pole transformer and the actual condition of the installation in question as a foundation, we consider the immediate circumstances of the fire. It was raining heavily on the night of September 28, 1974. As mentioned above, the electrical insulator on the top of the cross bar of the utility pole was missing, the fuse was broken in several pieces and the primary wire with a current of 4800 volts was resting on the wooden cross bar. Mr. McCowen gave the following testimony, substantially corroborated by Dr. Steber, concerning the probable sequence of events at this point:

". . . When the rain started on the date of the accident the cross arm would have become damp. It's also contaminated with dirt and the like. At this point in time the electrical energy in the primary wire probably started to arc[1] from that wire to ground. . . When its trying to get to ground the nearest ground point it can find is a ground wire which is stapled underneath

[1] Arching is the ability of electricity to jump from one point to another. It is the passage of electricity through the air, not along or through a conductor.

this cross arm to connect the bottom part of the lightning arrester to the ground wire which goes down the pole a distance of perhaps three inches, maybe four inches; until it can find enough of a conducting path through the damp and wet cross arm nothing will happen. As soon as the conducting path becomes energized the electricity will start to arc over the surface of the cross arm. . . At the point where the primary fuse cut out and fell in two . . . at that point in time the service to the transformer has been disconnected; normal power flow is interrupted.

". . .

"With the normal service to the transformer interrupted by the fact that the fuse cutout has broken entirely in two and disconnected it, with the arcing continuing from the primary wire across the cross arm it appears that the primary—the circuit was established between the primary wire and the case of the transformer. . . [T]he primary power getting into the outside of the case of the transformer broke down the insulation between the transformer tank and the secondary windings of the transformer, they probably had been damaged by the lightning surge which took place several days before. . . [W]hen the insulation breaks down to a sufficient point the forty-eight hundred volts would arc from the transformer tank through the insulating medium, including the insulating oil to the secondary coil of the transformer, and in doing this it would cause a violent burning. At the same time the primary voltage, rather than being transformed from forty-eight hundred volts to a hundred and twenty volts would be going directly into the secondary leads and through the secondary conductors in the service drop into the home. At the same time this arcing is occurring under the oil. The energy is very, very high. The oil would bubble, it would burn, it would generate tremendous amounts of gas and in a very short period of time probably in a matter of seconds would blow the cover off the transformer, and the cover was blown off the transformer in this case."

After the explosion, McCowen further testified, the secondary bushings were blown out and fused together.

Consequently an electrical path formed from the 4800 volt side—or the primary side—to the secondary side which led directly to the house.

The house was protected by circuit breakers or fuses. However, electrical service entrances to residences have a maximum voltage rating of 600 volts. As the expert testimony revealed, applying a voltage in excess of the voltage rating of the fuses and/or circuit breakers for the home circumvents their function. The circuit breakers in the house were consequently of very little value under the circumstances.

With respect to the actual cause of the fire, it was Mr. McCowen's professional opinion that the high voltage, which through a unique set of circumstances entered the plaintiffs' premises, caused the incident. He further testified that a system which would be able to prevent the type of accident would be too expensive in terms of personnel and unacceptable in terms of the time customers would be required to stay without power pending reconnection. Dr. Steber gave his expert opinion that the high voltage of between 1000–4800 volts was unreasonably dangerous as applied to a residential home. While he could not say definitely that it did in fact cause the fire, he did say that there was enough voltage and enough current to cause it. However, Dr. Steber took issue with the position of the defendant that the voltage that reached the house was not actually supplied by the company, declaring—"Obviously the electricity came from the Wisconsin Electric Power Company." The first assistant chief of the Waukesha Fire Department at the time of the fire testified that his investigation of the remains of the building indicated that the fire was caused by an overload of electricity in the service entrance of the home.

At the close of the testimony the defendant electric company moved for a directed verdict on the grounds that the evidence demonstrated that the 4800 volt elec-

tricity escaped from the control of the Wisconsin Electric Power Company before it could be placed in the stream of commerce. The court reserved ruling on the motion until after the verdict.

A special verdict with the following three questions was submitted to the jury on September 16, 1976:

*"Question No. 1:* Was the electricity, when it left the possession of the Wisconsin Electric Power Company, in such defective condition as to be unreasonably dangerous to a prospective consumer?

*"Question No. 2:* If you answer Question No. 1 'yes,' then answer this question: Was such defective condition a cause of damage to the plaintiffs' house?

*"Question No. 3:* What sum of money will reasonably compensate the plaintiffs for the damage to their house?"

After three hours deliberation the jury returned the verdict with an answer of "No" to the first question and $25,000 to the third.

Plaintiffs' motion for a change in the verdict and for judgment notwithstanding the verdict was denied.

The issues as we see them are as follows:

1. Does the doctrine of strict liability in tort as defined in *Dippel v. Sciano,* 37 Wis.2d 443, 155 N.W.2d 55 (1967), apply to electricity?

2. Did the trial court err in refusing to set aside the jury's answer to Question No. 1 of the special verdict that the electricity, when it left the possession of the Wisconsin Electric Power Company, was in such defective condition as to be unreasonably dangerous to a prospective consumer?

3. Should public policy considerations preclude the imposition of strict liability under the facts of this case?

This is a products liability action and is founded upon sec. 402A, Restatement, 2 *Torts* 2d, pp. 347–48, as adopted and modified by this court in *Dippel v. Sciano, supra,* 37 Wis.2d at 459. The section reads as follows:

"Sec. 402A.  **Special Liability of Seller of Product for Physical Harm to User or Consumer**

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

The court's modification of this rule in *Dippel* was intended merely to accommodate Wisconsin's system of tort liability which includes the principle of comparative negligence under which the plaintiff is subject to a diminution of his damages in the event that and to the extent that he contributed to the injuries.[2]

Strict liability does not make the manufacturer or seller an insurer nor does it impose absolute liability.[3] It is not enough for the plaintiff merely to show that he was using the product and he was injured. In the language of *Dippel,* at 460:

"The plaintiff must prove (1) that the product was in defective condition when it left the possession or

[2] *Dippel v. Sciano, supra,* 37 Wis.2d at 460–61; *Barter v. General Motors Corp.,* 70 Wis.2d 796, 802, 235 N.W.2d 523 (1975).

[3] *Dippel v. Sciano, supra,* 37 Wis.2d at 459–60; *Howes v. Deere & Company,* 71 Wis.2d 268, 272, 238 N.W.2d 76 (1976).

control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product or, put negatively, that this is not an isolated or infrequent transaction not related to the principal business of the seller, and (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was when he sold it."

Furthermore, certain defenses are available to the manufacturer or seller: contributory negligence, misuse, abuse or alteration of the product, inherent or unavoidable danger, natural wear, assumption of risk. *Id.*

This court in *Dippel*, at 450–51, summarized the solid public policy considerations which underlie the rule:

"The reason, which has been reiterated most often, is that the seller is in the paramount position to distribute the costs of the risks created by the defective product he is selling. He may pass the cost on to the consumer via increased prices. He may protect himself either by purchasing insurance or by a form of self-insurance. In justification of making the seller pay for the risk, it is argued that the consumer or user has the right to rely on the apparent safety of the product and that it is the seller in the first instance who creates the risk by placing the defective product on the market. A correlative consideration, where the manufacturer is concerned, is that the manufacturer has the greatest ability to control the risk created by his product since he may initiate or adopt inspection and quality control measures thereby preventing defective products from reaching the consumer."

Comment *c* of sec. 402A, Restatement, 2 *Torts* 2d, at 349–50, provides this analysis of the policy basis for the rule:

". . . the seller, by marketing his product for use and consumption has undertaken and assumed a special responsibility toward any member of the consuming

public who may be injured by it; . . . public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products."

These social policy justifications must be kept in mind in applying the strict liability rules set forth above to the facts of the present case.

The defendant electric power company makes the argument that as a general matter the rule of strict liability in tort is inapplicable to the sale of electricity. The company bases this contention on its view that electricity is not a product and on this court's holding in *Kemp v. Wisconsin Electric Power Co.*, 44 Wis.2d 571, 172 N.W.2d 161 (1969). We believe the companys' understanding of the scope of the term "product" is mistaken and its reliance on *Kemp* is misplaced.

*Kemp* involved an action for damages for injuries sustained when the child plaintiff contacted the electric power company line while controlling a gasoline powered model airplane. Significantly, the court held that strict liability as defined in *Dippel, supra*, 37 Wis. 2d at 583, had no application to the facts of the case, since "[t]he electricity which injured Daniel Kemp had not been sold but was still in the control of the defendant." The reasoning of the court in disposing of the strict liability issue is in fact authority for the proposition that Wisconsin had implicitly adopted the view that electricity is a product subject to the rule of strict liability in the appropriate case. Logically, the court's citation of the words of *Oesterreich v. Claas*, 237 Wis. 343, 349–50, 295 N.W. 766 (1941), that ". . . the liability is nevertheless grounded upon negligence and is not the liability of

an insurer. . . ." must be understood to refer to situations where the electricity has not yet been sold and strict liability concepts cannot come into play. In *Kemp*, the injured party was neither a purchaser nor a user— here the plaintiffs were both. To classify electricity as a product, by virtue of the definition we have set forth above, is warranted, indeed mandated, by the social policies which underlie and justify the imposition of strict liability on sellers who place dangerously defective products into the stream of commerce.

We agree with the trial court's conclusion that electricity can be a product within the meaning of sec. 402A and therefore subject to principles of strict liability in tort in appropriate cases.

The sole fact that the rule of strict liability in tort can be applied to the sale of electricity is insufficient to impose liability on the electric company in the present case. Plaintiffs were obliged to prove that the electricity, when it left the possession of the electric company, was in a defective condition unreasonably dangerous to the consumer or his property.

In *Vincer v. Esther Wms. All-Alum. S. Pool Co.*, 69 Wis.2d 326, 330–31, 230 N.W.2d 794 (1975), this court cited and applied the following Restatement definitions for "defective condition" and "unreasonably dangerous:"

"Comment *g* to sec. 402A of Restatement, 2 *Torts* 2d, defines 'defective condition' in part as follows:

" '*g. Defective condition.* The rule stated in this Section applies only where the product is, at the time it leaves the sellers hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.'

". . .

"Comment *i* to sec. 402A of the Restatement defines 'unreasonably dangerous' in part as follows:

" 'i. *Unreasonably dangerous.* The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by "unreasonably dangerous" in this Section. *The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'* (Emphasis supplied.)"

The court, *id.*, at p. 332, elaborated further on the applicable standard:

"Thus, the test in Wisconsin of whether a product contains an unreasonably dangerous defect depends upon the reasonable expectations of the ordinary consumer concerning the characteristics of this type of product. If the average consumer would reasonably anticipate the dangerous condition of the product and fully appreciate the attendant risk of injury, it would not be unreasonably dangerous and defective. This is an objective test and is not dependent upon the knowledge of the particular injured consumer, . . ."

Despite the formulation of this general test, this court has held that "defect" is not susceptible of any general definition and can only be defined on a case-by-case basis. *Jagmin v. Simonds Abrasive Co.*, 61 Wis.2d 60, 66, 211 N.W.2d 810 (1973); *see also*, Annot. (1967), 13 A.L.R. 3d 1057, 1078, sec. 6(b).

Turning again to the facts of this case, we begin with the proposition that strict liability may be imposed on the electric company only if the electricity, when it left the seller's hands, was in a condition not contemplated

by the ultimate consumer and unreasonably dangerous to him, *i.e.*, dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

With regard to this issue, the trial court instructed the jury in relevant part as follows:

"A product is said to be defective when it is not reasonably fit for the ordinary purposes for which such product was sold and intended to be used, and the defect arose out of the design, manufacture or inspection while the article was in control of the seller.

"A defective product is unreasonably dangerous to the user or consumer when it is dangerous to an extent beyond which would be contemplated by the ordinary user or consumer possessing the knowledge of the product's characteristics which were common to the community." Cf. 3260, Wis J I—Civil, Part II.

The electricity which passed through the electric meter controlled by the defendant electric power company and into the plaintiffs' house had a voltage between 1000 and 4000 volts. It was undisputed that 120–240 volts was the voltage normally distributed to residental consumers and was the voltage the plaintiffs had actually purchased for their house. The evidence was also clear and uncontroverted that such high voltage was unreasonably dangerous for use in a residental home and did in fact cause the fire which occurred on September 28, 1974. While 4800 volt electricity may be safe and suitable for some purposes, it is clear from the evidence in this case that such voltage as applied to an ordinary private residence is "defective" and "unreasonably dangerous" within the meaning of the products liability doctrine as adopted in Wisconsin. Indicative of the fact that the possibility of such an excessively high electrical overload rendered the electricity dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchased it is the fact that ordinary

homes are protected by circuit breakers or fuses with a maximum voltage rating of only 600 volts.

Review of the evidence in the present case reveals that the testimony and evidence is insufficient to sustain the jury verdict. We believe the credible evidence in this case unequivocally leads to but one finding—the electricity when it left the possession of the Wisconsin Electric Power Company was in such defective condition as to be unreasonably dangerous to a prospective customer. It follows that the trial court should have granted the motion to change the answer of Question No. 1 from "No" to "Yes."

The electric company contends that the jury verdict can also be sustained on the ground that the electricity left the company's possession before passing through the electricity service entrance and into the plaintiffs' house. The company bases this argument on the testimony of Mr. McCowen that at some point in the sequence of events leading up to the fire the 4800 volt electricity in the primary wires arced across the surface of the crossarm to the transformer case thus triggering the events which culminated in the explosion of the transformer, the fusing together of the secondary bushings, and finally the passage of the 4800 volt electricity to the secondary wires leading to the plaintiffs' house. We do not believe this argument is meritorious. The 4800 volt electricity was in the control of Wisconsin Electric Power Company as it passed—however it passed—along the primary wires, through the transformer, over the secondary wires and up to the electric meter owned and controlled by the defendant company. It did not leave the defendant's possession until it passed through the electric meter (the point at which the sale is made) and into the customer's house. Given the characteristics of

electricity, any other conclusion would unreasonably insulate a power company from liability—even under a negligence theory.

The respondent also asserted the defense that an Act of God, *i.e.*, lightning, was an intervening superseding cause of the fire. This court has never specifically declared that this defense is available in a products liability action. *Dippel, supra*, 37 Wis.2d 443, makes it clear that the plaintiff is required to prove causation, *i.e.*, that the defect in the product was a cause (substantial factor) of the plaintiff's injuries or damages. It would seem logical, therefore, that an Act of God defense—as it affects causation—might be available in some limited circumstances. It is questionable however whether lightning striking a utility pole could or should come within the Act of God doctrine under the circumstances of the present case. Lightning strikes are a fairly frequent, foreseeable, and recurring problem for one engaged in the generation and distribution of electricity. Indeed, electric power lines and utility pole installations are equipped with special safety devices to minimize the consequences of just such occurrences. The defense therefore should not be available to the electric company to relieve it of strict liability for its defective and unreasonably dangerous product in this case. Many years ago in *Jackson v. Wisconsin Telephone Co.*, 88 Wis. 243, 253, 60 N.W. 430 (1894), this court said:

"The further argument is made that the stroke of lightning was the 'act of God,' for which no one is responsible. Certainly a stroke of lightning is an 'act of God;' but that is not the question here presented, or rather another element—i.e. the negligence of man—is added to the question, which materially alters its scope. If I, owning a high mast or building, which I know is so situated as to be likely to be struck by lightning, construct an attractive path for the lightning to my neigh-

bor's roof, so that his house is destroyed by a bolt which strikes my mast or building, shall I escape liability for my negligent or wrongful act by pleading that the lightning was the act of God? Certainly not. I invited the stroke of one of the most destructive powers of nature, and negligently turned its course to my neighbor's property. The principle is the same as that involved in the case of *Borchardt v. Wausau Boom Co.* 54 Wis. 107. The lightning stroke is in no greater degree the act of God than the usual freshets occurring in a river."

The defendant-respondent also argues that public policy factors should preclude the imposition of liability in this case.

The relevant public policy considerations weigh heavily in favor of the consumer in the present case. Consumer self-protection from the defective and unreasonably dangerous product, namely, electricity of an excessively high voltage, is not feasible in the case of the ordinary consumer. Abstention from use of the product is unrealistic; electric power supplied by a sole electric company is generally the sole source of electricity. In addition, the seller here is in a better position to anticipate, protect against and eliminate possible dangerous electricity overloads of this type. Finally, the seller can more easily absorb or spread or insure against any financial losses which result.[4] Public policy considerations do not preclude the imposition of liability in this case.

We therefore conclude that the trial court should have granted the plaintiffs' motion to change the answers to Questions 1 and 2 of the verdict to "Yes" and the motion

[4] Fischer, *Products Liability—The Meaning of Defect,* 39 Mo. L. Rev. 339, 359 (1974); Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L. J. 825, 837–38 (1973); Calabresi and Hirschoff, *Toward a Test for Strict Liability in Torts,* 81 Yale L. J. 1055, 1056 (1972).

for judgment notwithstanding the verdict. Judgment should be for the plaintiffs.

*By the Court.*—Judgment and order reversed and cause remanded for further proceedings not inconsistent with this opinion.