Brad KOLPIN, and Virginia Kolpin, Plaintiffs-
Respondents-Cross Appellants,†

v.

PIONEER POWER & LIGHT COMPANY, INC.,
Defendant-Appellant-Cross Respondent.

Court of Appeals

*No. 88-2076. Orally argued September 26, 1989.—Decided
January 25, 1990.*

(Also reported in 453 N.W.2d 214.)

†Petition to review granted.

488

For the defendants-appellants-cross respondents there were briefs by *Lindsay G. Arthur, Jr.* of *Arthur, Chapman & McDonough, P.A.* of Minneapolis, Minnesota, and oral argument by *Lindsay G. Arthur, Jr.*

For the plaintiffs-respondents-cross appellants there were briefs by *William J. Corrigan* of *Menn, Nelson, Sharratt, Teetaert & Beisenstein, Ltd.* of Appleton, Wisconsin, and oral argument by *William J. Corrigan.*

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J.  Pioneer Power and Light Company, Inc., appeals from a judgment upholding a jury verdict awarding Brad and Virginia Kolpin $133,326.90 for damage to their dairy herd caused by stray electrical voltage. The case was submitted on three theories of

liability—negligence, strict liability in tort and nuisance—and the jury found in the Kolpins' favor on all three. Because there was a statute of limitations issue in the case the jury was also asked to determine whether the Kolpins discovered their cause of action against Pioneer more than six years before commencing suit. The jury answered the question in the affirmative but the trial court, concluding that Pioneer's negligence was "continuing," ruled that the action was not barred and upheld the jury's verdict. The Kolpins cross-appeal from the judgment insofar as it upholds that portion of the verdict dealing with their "discovery" of the cause of action.

We disagree with the trial court's ruling that the Kolpins' negligence claim was not time-barred. There is evidence to support the jury's determination of the time of discovery of the cause of action and because the Kolpins did not commence action within six years thereafter, their negligence claim is barred by sec. 893.52, Stats., which requires actions for damage to real or personal property to be brought within six years "after the cause of action accrues." As for the strict liability and nuisance claims, we hold that it was error to submit the former claim to the jury and we consider the Kolpins' failure to respond to Pioneer's arguments on nuisance as abandoning that theory of recovery. We therefore reverse the judgment.

The Kolpins are dairy farmers. In March, 1977, shortly after they moved their herd to a new milking parlor, the Kolpins began to notice unusual behavior patterns, a high incidence of mastitis among the cows and milk production declined.

The problems continued and in late 1979 or early 1980, after Brad Kolpin read an article in a farm magazine about stray voltage and its possible harmful effects

on dairy cows, he purchased a volt meter and began taking measurements. He also asked an electrician to come to the farm to test for stray voltage in the milking parlor.

In the spring of 1980 Kolpin contacted Pioneer about the problems he was experiencing and the utility sent an employee and a Public Service Commission engineer to the farm to take voltage measurements. Shortly thereafter, Pioneer placed twenty additional grounding rods on the distribution line servicing the Kolpins' farm. After the rods were installed there was an immediate decrease in the measured voltage in the parlor. Although Kolpin continued to experience difficulties with his cows, he never contacted Pioneer again until he brought this suit in 1987.

The Kolpins sued on three theories—negligence, strict liability and nuisance—and, as indicated, the jury found in their favor on all three. The jury also found, however, that the Kolpins discovered their cause of action more than six years before bringing suit and, based on that finding, Pioneer moved for judgment notwithstanding the verdict dismissing the action as time-barred under sec. 893.52, Stats. The trial court denied the motion holding that the "continuum of negligence rule" applied and, as a result, the statute of limitations did not begin to run when the Kolpins discovered their cause of action but was, in effect, tolled as long as there was any stray voltage in the area of the milking parlor.

Construction and application of statutes of limitation involve questions of law which we review independently, without deference to the trial court. *Esser Distributing Co. v. Steidl,* 145 Wis. 2d 160, 164, 426 N.W.2d 62, 64 (Ct. App. 1988), *aff'd,* 149 Wis. 2d 64, 437 N.W.2d 884 (1989).

In *Hansen v. A.H. Robins, Inc.,* 113 Wis. 2d 550, 335 N.W.2d 578 (1983), the supreme court adopted the "discovery rule" for determining accrual of tort claims within the meaning of applicable statutes of limitation. The court, overruling earlier cases holding that such claims accrue at the time of the negligent act or injury, held that all tort actions "shall accrue on the date the injury is discovered or with reasonable diligence should be discovered, whichever occurs first." *Id.* at 560, 335 N.W.2d at 583.

While we have not had the opportunity to decide whether the discovery rule applies to stray voltage cases, we recently gave our tacit approval to its use in such a case. In *Ford Farms v. Wis. Elec. Power Co.,* 145 Wis. 2d 650, 430 N.W.2d 94 (Ct. App. 1988), a dairy farmer sued a power company alleging that the company allowed stray voltage to damage cows on his farm. Noting that there was no dispute "that the discovery rule applies," we remanded the case to the trial court to determine when the farmer discovered the cause of action. *Id.* at 658-59, 430 N.W.2d at 97.

The Kolpins argue that the discovery rule is inapplicable—that stray voltage cases should be governed by the "continuous negligence" rule first articulated by the supreme court in *Tamminen v. Aetna Casualty & Surety Co.,* 109 Wis. 2d 536, 327 N.W.2d 55 (1982). *Tamminen* was a medical malpractice case in which the court held that "where there is a continuum of negligent medical care related to a single condition occasioned by negligence," there is a single cause of action which "is not complete until the last date on which the malpractice occurred." *Id.* at 556, 559, 327 N.W.2d at 64-65. Thus, "[i]f an action is timely brought in relationship to that last date, the entire cause of action is . . . timely." *Id.* at 559, 327 N.W.2d at 65-66.

The trial court applied the *Tamminen* rule, apparently concluding that the stray voltage constituted a continuous course of negligent conduct on Pioneer's part which, according to the Kolpins, did not cease until 1983 when they finally installed an electronic grounding system. We disagree. We believe the continuous negligence rule is limited to cases involving negligent medical treatment.

Prosser, characterizing the rule as one of "a series of transparent devices [designed] to get around the [old] rule[s]" in malpractice cases, described its underlying purpose as relieving victims of medical malpractice from the "hardship" caused by imposing a strict rule of limitation in such cases where, because of the nature of the claim, "the statute . . . run[s] before the plaintiff discovers that he [or she] has suffered any injury at all." W. Prosser, *The Law of Torts,* 144 (4th ed. 1971).

Other commentators have observed that the continuous negligence rule has many practical justifications, including: (1) encouraging strong physician-patient relationships; (2) not punishing a patient for relying upon a physician's skill, judgment and advice; and (3) recognizing that a patient should not be forced to litigate against his or her physician while still under the physician's care. Reeves and Hirsh, *For Whom the Bell Tolls: The Statute of Limitations and Medical Malpractice,* 32 Medical Trial Techniques Quarterly 414, 424 (1986).

The Kolpins' principal argument is that *Tamminen* should not be restricted to medical malpractice actions because in that case the "court cited several nonmedical cases in support of its holding," notably *Ewing v. General Motors Corp.,* 70 Wis. 2d 962, 236 N.W.2d 200 (1975); *Milwaukee County v. Schmidt, Garden & Erikson,* 43 Wis. 2d 445, 168 N.W.2d 559 (1969); and *Oos-*

*terwyk v. Bucholtz,* 250 Wis. 521, 27 N.W.2d 361 (1947). We are not persuaded.

*Ewing,* a strict liability automobile accident case, was mentioned by the *Tamminen* court not as authority for adoption of the rule but simply as an illustration of a "similar approach" used in cases defining the term "cause of action" where the claim is misjoinder of issues and the initial question is "whether a complaint states more than one cause of action . . .." *Tamminen,* 109 Wis. 2d at 556-57, 327 N.W.2d at 64. The other two cases were also cited for comparison purposes—to illustrate that the continuous negligence rule being adopted by the court was "also consistent with" the holding in *Oosterwyk* (that a claim for false imprisonment accrues when the imprisonment terminates) and with *dicta* in *Milwaukee County* (stating that a claim for negligent supervision of construction could be maintained if any negligent acts occurred within six years prior to the filing of the action). *Tamminen,* 109 Wis. 2d at 557, 327 N.W.2d at 65.

*Tamminen* was itself a medical malpractice case and the court's opinion indicates quite clearly, we believe, that in formulating and adopting the continuous negligence rule it placed specific and principal reliance on "the rationale" of three medical malpractice cases—one from Oregon and two from Virginia.[1] *Tamminen,* 109 Wis. 2d at 556, 327 N.W.2d at 64. After discussing those cases, the court concluded: "We hold that the statute of limitations *for a course of negligent medical treatment* accrues at the time of the last act of negligence that was a part of a continuum of malpractice, and that *in the circumstances stated here* there is but a single cause of

---

[1]*Hotelling v. Walther,* 130 P.2d 944 (Ore. 1942); *Farley v. Goode,* 252 S.E.2d 594 (Va. 1979); and *Fenton v. Danaceau,* 255 S.E.2d 349 (Va. 1979).

action *that encompasses the entire course of malprac-tice,* and suit was timely brought." *Id.* at 563, 327 N.W.2d at 67 (emphasis added).

Finally, we note that in a later case the supreme court itself recognized the limited application of the *Tamminen* rule when it stated: "This court in *Tamminen* saw fit to adopt a new rule for *cases involving negligent medical treatment.* In the medical malpractice context special considerations arise." *Robinson v. Mt. Sinai Medical Center,* 137 Wis. 2d 1, 25, 402 N.W.2d 711, 721 (1987) (emphasis added).

We conclude, therefore, that the Kolpins' cause of action accrued and the six-year limitation of sec. 893.52, Stats., began to run when they "discovered or with reasonable diligence should [have] discovered" their injury. *Hansen v. A.H. Robins, Inc.,* 113 Wis. 2d at 560, 335 N.W.2d at 583. We thus consider whether there is evidence to support the jury's verdict that that "discovery" occurred some time before February 17, 1981—a date six years prior to commencement of the action.

On their cross-appeal, the Kolpins argue that there was insufficient evidence to support the jury's finding that the Kolpins knew or should have known prior to February 17, 1981, that "Pioneer's electrical distribution system was a cause of damage to their dairy operation." Our review of jury verdicts is quite limited. The jury's findings will not be upset if there is "any credible evidence which under any rational view fairly admits of an inference which will support [them.]" *Herman v. Milwaukee Children's Hospital,* 121 Wis. 2d 531, 542, 361 N.W.2d 297, 301 (Ct. App. 1984). This is even more true where, as here, the trial court has approved the verdict. *Fehring v. Republic Ins. Co.,* 118 Wis. 2d 299, 305, 347

N.W.2d 595, 598 (1984). We search the record for evidence to support the verdict the jury returned, not for evidence to sustain a finding the jury could have but did not make. *Id.* at 306, 347 N.W.2d at 598.

Soon after moving into their new milking parlor in March, 1977, the Kolplins began experiencing problems with their cows including behavioral problems, an increase in mastitis and a decrease in milk production. Sometime in the fall of 1979 or the spring of 1980, Brad Kolpin read an article about a farmer with similar herd problems that were caused by stray electrical voltage. He purchased a meter and began measuring the voltage in his milking parlor, receiving readings between twelve and fifteen volts.

In April, 1980, Kolpin hired an electrician who came to the farm to search for "stray voltage on milk line." Immediately after the electrician's visit Kolpin contacted Pioneer, complaining that he "had some voltage problems." Pioneer sent an employee, Dennis Dahlke, to the Kolpin farm to obtain voltage readings. A few days later, a Public Service Commission engineer, Stuart Rasmussen, came to the farm to take additional measurements. Shortly thereafter, Pioneer installed approximately twenty additional grounding rods on the distribution line serving the Kolpin farm, and Kolpin continued to measure for stray voltage throughout the spring and fall of 1980. As indicated, voltage levels in the milking parlor decreased substantially after installation of the rods, and Pioneer had no further contact with the Kolpins until this action was commenced some seven years later.

This evidence provides adequate support for the jury's finding that the Kolpins knew or in the exercise of reasonable care should have known prior to February,

1981, that stray voltage was a cause of harm to their dairy operation. As a result, their negligence cause of action is barred by sec. 893.52, Stats.

Pioneer makes no statute of limitations argument with respect to the Kolpins' strict liability and nuisance causes of action. It opposes those claims on their merits.

■

Wisconsin has adopted the doctrine of strict liability as discussed in *Restatement (Second) of Torts,* sec. 402 A (1965). *Dippel v. Sciano,* 37 Wis. 2d 443, 459, 155 N.W.2d 55, 63 (1967). The following elements must be proved in order for strict liability to attach:

> (1) that the product was in defective condition when it left the possession or control of the seller,
> (2) that it was unreasonably dangerous to the user or consumer,
> (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages,
> (4) that the seller engaged in the business of selling such product . . . and
> (5) that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was in when he [or she] sold it. *Dippel,* 37 Wis. 2d at 460, 155 N.W.2d at 63.

Section 402A applies to sales of defective products, not to services. Electricity—the flow of charged particles along a conductor—does not seem to fit normal definitions of a "product." Nor does Pioneer, who really does no more than set in motion the necessary elements that allow electricity to flow from one point to another, fit the usual definition of a manufacturer. It is more akin to a distributor—the provider of a service.

We are aware, however, that the supreme court, in *Ransome v. Wisconsin Electric Power Co.,* 87 Wis. 2d

605, 620, 275 N.W.2d 641, 648 (1979), held that electricity can be a product within the meaning of the Restatement. But the electricity in that case was something entirely different from stray voltage, and we do not believe it controls the result in this case.

In *Ransome,* the court was called upon to decide whether the power company could be held strictly liable for damage caused by electricity traveling through the utility's lines into the plaintiff's house at a voltage between 1,000 and 4,000 volts. The utility's transformer, which normally reduces the 4800 volt line voltage to 120–240 volts prior to entry to homes or businesses, had exploded after the line was struck by lightning, allowing extremely high levels of voltage to enter the home. The court reversed the jury's verdict against the plaintiff and recognized that electricity of such a voltage was both " 'defective' and 'unreasonably dangerous' within the meaning of the products liability doctrine" when it entered a private residence. *Id.* at 622, 275 N.W.2d at 649.

The Kolpins' problem had nothing to do with any defect in Pioneer's lines or equipment or in the electricity sent through the company's system to their farm. Rather, it had to do with stray voltage, a natural, low-voltage byproduct of the transmission of electric power. Electricity is distributed to customers through two wires, a "hot" wire sending it to the customer and a "neutral" wire returning it to the generating station. Stray voltage is a counterpart of any grounded electrical system. It is not "sold" to or even used by the consumer. It is, as one of the expert witnesses testified, "one of the basic phenomena of electricity . . . [t]here's always going to be some."

In *Kemp v. Wisconsin Electric Power Co.,* 44 Wis. 2d 571, 172 N.W.2d 161 (1969), a plaintiff also sought to

apply strict liability principles to injuries caused by electric power furnished by a utility. There, a young boy was injured when a gasoline-powered model plane he was flying came into contact with an overhead power line. The court rejected the strict liability claim on the basis that the power had not been sold by the utility. *Ransome*, 87 Wis. 2d at 619, 275 N.W.2d at 647. The *Ransome* court, distinguishing *Kemp,* emphasized that the electricity entering Ransome's home had been sold—it had left the seller's hands and had actually been purchased by him. *Id.* at 619–20, 275 N.W.2d at 647–48. We make a similar distinction here: stray voltage is not sold to the homeowner. It is much more akin to the line voltage causing injury in *Kemp* than the "purchased" electricity in *Ransome.*

We do not believe, therefore, that *Ransome* controls the issue before us. Instead, we feel that the decision of the Ohio Supreme Court in a stray voltage case very similar to this one, *Otte v. Dayton Power & Light Co.,* 523 N.E.2d 835 (Ohio, 1988), is more to the point. In *Otte,* a dairy farmer sought to hold an electric utility strictly liable—under the provisions of sec. 402A— for damages to a dairy herd allegedly caused by stray voltage. Holding that "strict liability in tort for damages caused by [stray voltage] is not a cause of action that may be asserted against a public utility," *id.* at 842, the court reasoned:

> [N]eutral-to-earth [stray] voltage, the purported "product" in this case, has no benefit to the consumer, is clearly not the subject of a "sale" to a consumer, and is indisputably not "defective." Neutral-to-earth voltage is neither marketed nor marketable. . . . The stray voltage involved here is nothing more than the byproduct of the transmission of electrical power . . . "a normal and natural condition which is

common to every power distribution system in this country."

*Id.* at 838–39 (citations omitted).

We believe the Ohio court's reasoning is equally applicable here. Whether or not electricity actually sold to a customer which enters the customer's house at twenty times the normal voltage may be considered a product subject to the provisions of sec. 402A, as in *Ransome,* the entity or phenomenon alleged to have caused the damage in this case—the stray voltage—was something else altogether. It was a "normal and natural condition" common to all power distribution systems. *Otte,* 523 N.E.2d at 839. And, like the Ohio court, we do not believe it may be the subject of an action for strict liability under the Restatement rule. We conclude, therefore, that the trial court erred in submitting the issue to the jury.

Pioneer also contends that it was error to put the nuisance question to the jury. Arguing from various Wisconsin cases and the pattern jury instructions indicating that liability for nuisance requires proof beyond that which would support a finding of negligence—notably the "unreasonable or unlawful use of . . . property" and the "seller's" knowledge of the hazard[2]—Pioneer maintains that additional instructions were required in order to properly place the case before the jury.

The Kolpins' only reference to the "nuisance" issue is simply to assert that there was evidence in the record that their cows were damaged by stray voltage from Pio-

[2]*Plesko v. Milwaukee,* 19 Wis. 2d 210, 120 N.W.2d 130 (1963); *Walley v. Patake,* 271 Wis. 530, 74 N.W.2d 130 (1956); Wis J I—Civil 1920 (1962).

neer's transmission and distribution of electricity to the farm. They do not respond to the arguments or the cases cited by Pioneer. We have long taken the position that a respondent's failure to refute the appellant's propositions amounts to a confession that they are sound. *State ex rel. Blank v. Gramling,* 219 Wis. 196, 199, 262 N.W. 614, 615 (1935), quoted in *State ex rel. Sahagian v. Young,* 141 Wis. 2d 495, 500, 415 N.W.2d 568, 570 (Ct. App. 1987). In *Charolais Breeding Ranches v. FPC Securities,* 90 Wis. 2d 97, 108-09, 279 N.W.2d 493, 499 (Ct. App. 1979), for example, the respondent—like the Kolpins, a plaintiff who had recovered in an action against the appellant—failed to address two issues raised in the appellant's attack on the judgment. We held that because "respondent . . . does not address the issues raised on appeal . . . [w]e take this to mean that [it] has jettisoned this theory of recovery." We reach the same result here.

*By the Court.*—Judgment reversed.

GARTZKE, P.J. (*dissenting*).   This case was not fully tried. For that reason, we should exercise the discretionary authority under sec. 752.35, Stats., to order a new trial. The new trial should be limited to the farmers' damages and contributory negligence, if any, from February 17, 1981 through the date their stray voltage problem was cured and their milk production returned to normal.

The facts on which I base my dissent are these. The company was negligent in the manner in which it provided electricity to the dairy farm, and that negligence was a cause of the farmers' damages. Those jury findings are not disputed on appeal. The farmers knew or should have known before February 17, 1981 that the company's electrical system was a cause of those damages.

501

The company insists on the accuracy of the jury's finding to that effect, and the farmers do not seriously dispute it. The company's electrical distribution system continued to cause damages to the farmers after February 17, 1981 until early 1985. Their cows suffered shocks from stray voltage during that period, and the farmers' milk production continued to suffer. During that same period the farmers attempted to cure their problem and finally did so through the installation of an anti-stray voltage grounding system. Finally, the jury found the farmers were contributorily negligent, and a basis exists for that finding.

I agree with the majority that the farmers cannot recover for their damages which accrued before February 17, 1981. The reason is that the Kolpins knew, or in the exercise of reasonable care should have known, before that date that the company's electrical distribution system was a cause of their damage and they commenced this action on February 17, 1987. The applicable limitations period is six years under sec. 893.52, Stats. In a negligence action, the cause of action accrues after an injury has occurred and has been or should have been discovered. *Hanson v. A.H. Robins, Inc.*, 113 Wis. 2d 550, 560, 335 N.W.2d 578, 583 (1983).

But the record contains ample evidence from which the jury could conclude that because it could be removed or its effects avoided, the cause of the farmers' damages was temporary. After the company added grounding rods to its distribution lines to the Kolpin farm, the stray voltage level in the milking parlor decreased. This curative measure did not, however, completely eliminate the stray voltage problem, and the farmers' records show that they continued to suffer low milk production. They therefore attempted other measures, such as reducing the use of other electrical equipment while they were

milking and changing their schedule to milk at times other than the company's peak hours. These measures were partially successful since they reduced the stray voltage level and the behavior of their herd improved somewhat.

During 1983 the Kolpins learned from their electrical contractor that an experimental electronic grounding system developed by ITT Corporation was being installed on a nearby farm. In May 1984 the Kolpins installed such a system at a cost of $1,500.

Following that installation, the farmers' stray voltage level was reduced to .005 volts. The behavior of their herd improved, milk production began to increase and the amount of time they had to devote to milking was reduced. The change was gradual, but on January 16, 1985 the farmers wrote to ITT Corporation,

> We are very pleased with the results of our electronic grounding system in reducing the stray voltage caused by our power company's inability to effectively ground their primary neutral system. Some of the results are as follows: Milk time has been reduced by 30 minutes per milking; cattle are easier to work with; milking is much less stressful for the milkers now because cattle entering the milking parlor enter more willingly; they no longer kick the units off or kick the milkers. We have noticed a better milk letdown which has in turn increased our production by approximately 10 percent or 300 pounds per day and reduced voltage related mastitis considerably. Texture of the cows' udders are soft and there is very little teat end erection. Cows are not as nervous during milking.

If a tort results in a *temporary* cause of damages, then the injured party may bring successive actions to recover damages. The principle is illustrated in *Peterson*

*v. Wisconsin River Power Co.,* 264 Wis. 84, 58 N.W.2d 287 (1953). In *Peterson,* the plaintiffs brought an action against a power company for damage to their land during the year 1951 caused by seepage of water from the company's dam. The company counterclaimed, alleging that plaintiffs had suffered a permanent taking and should be awarded the value of the premises taken. The plaintiffs replied that the company had constructed ditches, the purpose of which was to carry off the water from their lands, and that it would therefore be improper to assess damages on a permanent rather than a yearly basis. The company demurred to the reply on grounds that it failed to state a defense. On appeal, the *Peterson* court held that if it were determined upon the trial that the plaintiffs' injuries were of a temporary nature, they were entitled to the relief prayed for in their complaint. The court relied on the proposition that if the cause of a plaintiff's damages is temporary, a right exists to successive actions. *Id.* at 88, 58 N.W.3d at 289.[1]

In my view, the reasons for the rule applied in *Peterson* are these: If the defendant causes damages and the cause is permanent, then the plaintiff's future damages can be determined and are therefore recoverable in a single action. If the cause can be cured, removed, or avoided, then future damages are speculative and not recoverable but may occur. If the plaintiff in the latter case cannot bring successive suits to recover those damages, the defendant acquires a license to continue to

---

[1]*Peterson* is consistent with *Carl v. The Sheboygan and Fond du Lac Railroad Company,* 46 Wis. 625, 629, 1 N.W. 295, 297 (1879) (in action for continuing trespass or nuisance resulting from railroad's installation of tracks on plaintiff's land, plaintiff could recover only damages sustained before commencing action and could bring future action for similar damages).

harm the plaintiff after paying only for past harm.[2] Nor should a defendant acquire a license to inflict more harm merely because a statute of limitations has barred recovery for damages which occurred more than six years before the present action was brought. Accordingly, the farmers in the case before us should be able to recover their continuing damages during the period February 17, 1981 to the date of trial.

The jury found that the farmers were contributorily negligent and attributed 30% of the total negligence to the farmers. That percentage, however, was not limited to the period from February 17, 1981 to the date that the farmers had solved their problem. For that reason, the contributory negligence of the farmers during that

---

[2]The *Restatement* recognizes the distinction in nuisance law between damages from a permanent cause and from a temporary cause. *Restatement (Second) of Torts* sec. 899 comment d (1977). The distinction was recognized and a rationale provided in a Tennessee case in which landowners sought damages for the negligent construction of a sewer. The court said,

> It seems to us that the true rule deducible from the authorities is that the law will not presume the continuance of a wrong, nor allow a license to continue a wrong, where the caus[e of] the injury is of such a nature as to be abatable either by the expenditure of labor or money; and that, where the cause of the injury is one not presumed to continue, the damages recoverable from the wrong-doer are only such as have accrued before [an] action [is] brought, and that successive actions may be brought for the subsequent continuance of the wrong or nuisance.

*City of Nashville v. Comer,* 12 S.W. 1027, 1030 (Tenn. 1890). Tennessee has approved the same rationale as late as 1962 in *Henegar v. International Minerals & Chemical Corp.,* 354 S.W.2d 69, 70 (Tenn. 1962). I see no reason why it should not be applied to negligence cases as well, at least where, as here, the plaintiffs suffer continuing harm from a temporary cause.

period, if any, should be resubmitted to the jury in the partial new trial.

This case was not tried on the theory that because the cause of the farmers' damages was temporary, they may recover their damages for the six years preceding the date they commenced their action. The result was that the jury was never asked questions in the verdict appropriate to the theory I have outlined. That should not deter us from exercising our discretionary power to order a new trial under sec. 752.35, Stats.

We may order a new trial under that statute "if it appears from the record that the real controversy has not been fully tried, . . . regardless of whether the proper motion or objection appears in the record." We may reverse under sec. 752.35, Stats., whether or not the appropriate requests were made for jury instructions or special verdict questions. *State v. Schumacher,* 144 Wis. 2d 388, 408, 424 N.W.2d 672, 679-80 (1988).

This would not be the first time that an appellate court has reversed a judgment and ordered a second trial on grounds that the first trial had not proceeded on the right theory. The Wisconsin Supreme Court has ordered new trials under such circumstances by exercising their discretionary authority in sec. 751.06, Stats., which is identical to that of the court of appeals in sec. 752.35, Stats. *See, e.g., Merrill Lynch, Pierce, etc. v. Boeck,* 127 Wis. 2d 127, 141-42, 377 N.W.2d 605, 611-12 (1985) (parties' reliance on court's erroneous decision to submit instruction on fiduciary theory meant party did not pursue claim under proper theory of case); *First Nat. Bank & Trust Co. v. Notte,* 97 Wis. 2d 207, 225-26, 293 N.W.2d 530, 539 (1980) (proper theory of case not advanced at trial); *Wagner v. Wagner,* 80 Wis. 2d 299, 304, 259 N.W.2d 60, 62 (1977) (trial court and parties failed to determine right of plaintiff to other applicable

remedies in action to obtain rescission of deed); *In Matter of Estate of Alexander,* 75 Wis. 2d 168, 189, 248 N.W.2d 475, 486 (1977) (parties and trial court failed to consider issue of liability on an agreement); *Banks v. State,* 51 Wis. 2d 145, 158-60, 186 N.W.2d 250, 257 (1971) (trial court had not fully considered self-defense provision); *Simonz v. Brockman,* 249 Wis. 2d 50, 54-55, 23 N.W.2d 464, 466 (1946) (issues existed which were insufficiently pleaded and proved as to amount recoverable by seller in contract case); *Rowell v. Rhadans,* 171 Wis. 86, 89-90, 175 N.W. 937, 938 (1920) (real question neither presented by the pleadings nor tried by the court); *Knudson v. George,* 157 Wis. 520, 523-24, 147 N.W. 1003, 1004-05 (1914) (negligence issue overlooked by trial court and parties).

We have good reasons to order a partial new trial on the theory I have described. Stray voltage cases are no longer novel in Wisconsin, a dairy state. All theories applicable to recovery in such cases should be explored. The farmers in the case before us assiduously attempted to remedy their problem. Their fault lay in their emphasis on self-help, since a jury could find that they failed to notify the company that its effort to cure the stray voltage problem through additional grounding had been unsuccessful. That they were able to cure their problem by use of an experimental anti-stray voltage device is not only a happy circumstance, but shows that power companies and farmers may solve a serious but curable problem which has plagued both groups. Farmers who strive toward such solutions should recover their damages which continue to accrue while they attempt in good faith to cure the problem.