Shawn C. WIEGERS, a minor, by his Next Friend, Raylene A. EVANS, and Raylene A. Evans, Respondents,

v.

John FITZPATRICK and Jan Fitzpatrick, Appellants.

No. WD 40535.

Missouri Court of Appeals, Western District.

Feb. 28, 1989.

Lance LeFevre, Kansas City, for appellants.

David Sexton, Kansas City, for respondents.

Before NUGENT, P.J., and CLARK and FENNER, JJ.

FENNER, Judge.

John and Jan Fitzpatrick appeal from a jury verdict and judgment entered thereon in favor of Shawn Wiegers and his mother, Raylene Evans (now Raylene Sharp), upon Wiegers' and Evans' suit to recover damages for injuries to Wiegers occasioned by the Fitzpatricks' negligence.

The facts, as they relate to the events surrounding the injury sustained by Shawn Wiegers are not in dispute. Suffice it to say that sometime before January 8, 1986, appellant, John Fitzpatrick, was informed that a warehouse near where he worked had discarded some shelving. He went to the warehouse and salvaged some of the parts of the shelving which he reconstructed on the back porch of his home. He also found and brought home two metal ladder structures that he assumed had been used to access the tops of the shelves. These ladders had very rough and sharp edges and appeared as if they had been either torched or hacksawed so that they might be severed from another metal structure.

After the ladders were brought home they were generally stored on the Fitzpatricks' back porch. According to Mr. Fitzpatrick the ladders were used only once to put plastic on the screens of his porch. With the exception of this one use, the ladders were stored on the back porch.

Mr. Fitzpatrick testified that on only one occasion had he seen the ladders other than on the back porch. On that one occasion Fitzpatrick noticed one of the ladders leaning up against the back fence at the rear of his back yard. He asked his children, a son, age 15 and a daughter, age 10, why the ladder was there and was told that the ladder had been used to climb over the fence. The children were told to put the ladder back on the porch and they were told not to use the ladders.

Jan Fitzpatrick testified that prior to January 7, 1986, she was unaware that the metal ladders had been acquired. The first time she saw the ladders was on the evening of January 7, 1986. Upon arriving home from work Jan noticed a shiny metal object as she pulled into the driveway of her home. As she drove into the driveway, her headlights were reflected by one of the ladders lying at the side of the house. She got out of her car, picked the ladder up out of the yard and leaned the ladder up against the side of the house.

Respondent, Shawn Wiegers, went to the Fitzpatrick home on the morning of January 8, 1986, and asked if Jennie, the Fitzpatricks' daughter could come out and play. Jennie came out, took her books to the bus stop and the two children proceeded to the yard where they were going to slide down an incline in the Fitzpatricks' yard.

Shawn Wiegers testified that he saw two ladders that day, one in the back where he and Jennie were playing and the other on the other side of the fence lying down. Jennie testified at trial that she got the ladder leaning on the side of the house and stuck it into the ground so that she and Shawn could slide down the hill then climb

back up with the aid of the ladder and that she had used the ladder for this purpose before the day of the accident that occurred herein. Shawn testified that the ladder was frozen in the ground when they began playing.

The children agreed that they began playing, Jennie first sliding and climbing up the ladder with Shawn following suit. After the second or third time Shawn had slid down the hill he fell on the ladder and lacerated his leg on the ladder's rough edges. After hearing Shawn scream, Jennie ran to tell her mother.

After calling Shawn's mother, Mrs. Fitzpatrick took Shawn to the hospital. As a result of the accident Shawn suffered a severe laceration on his leg, Shawn's mother, Raylene, filed suit on behalf of herself and her minor child to recover damages caused by appellants' negligence.

In point one of their appeal from the unfavorable jury verdict, the Fitzpatricks contend that the trial court erred in overruling their motion for directed verdict and judgment notwithstanding the verdict because the evidence failed to establish that the injuries to Shawn Wiegers were sufficiently foreseeable to impose a duty on their part, breach of which could be said to have been the proximate cause of the injury.

In reviewing whether the trial court erred in overruling the Fitzpatricks' motion, this court construes all evidence and inferences therefrom in favor of Wiegers, and determines whether a submissible case has been made. *Fricke v. Valley Production Credit Assn.*, 721 S.W.2d 747, 753 (Mo.App.1986).

Likewise, with regard to deciding whether Wiegers, who obtained a jury verdict, made a submissible case for purposes of review by this court of the trial court's refusal to grant the Fitzpatricks' motion for judgment notwithstanding the verdict, the evidence is viewed in a light most favorable to Wiegers giving him the benefit of all inferences which may be reasonably drawn from evidence in support of their cause of action. *Bizzle v. Enterprise Leasing*, 741 S.W.2d 84, 85 (Mo.App.1987)

Sustaining a motion for judgment notwithstanding the verdict should be done only when all of the evidence and the reasonable inferences to be drawn therefrom are so strongly against the plaintiff's (Wiegers) case that there is no room for reasonable minds to differ. *Id.*

Both parties agree that this is essentially a negligence action governed by § 339 of the Restatement (Second) of Torts. The task presented to this court, however, is the interpretation of the portions of § 339 which the parties dispute. Section 339 is set forth as follows:

§ 339. Artificial Conditions Highly Dangerous to Trespassing Children

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

Initially the parties dispute what constitutes an "artificial condition" upon the land. The Fitzpatricks take the position that the metal ladder structure was an ordinary physical object, as opposed to a fixture attached to the land or other classic conditions.

The Fitzpatricks point out that since the adoption of § 339 in *Salanski v. Enright*, 452 S.W.2d 143 (Mo.1970), the Missouri cases have addressed only the question of whether, or under what circumstances, the theory of § 339 may be applied to an ordinary physical object.

 Respondents, however, note that few courts have defined what constitutes an artificial condition and cite a South Dakota Supreme Court case wherein that court defined the terms to mean "a condition on the land created by the action of man." *Hofer v. Meyer*, 295 N.W.2d 333, 336–37 (S.D.1980). Borrowing that definition and applying it to the present factual situation, it is clear that the metal ladder structure obtained by Mr. Fitzpatrick was an "artificial condition" which he placed on his land.

The next inquiry pursuant to § 339 is whether the condition is one which the Fitzpatricks did realize or should have realized would involve an unreasonable risk of death or serious bodily injury to a child.

The Fitzpatricks argue that a ladder cannot, in and of itself, be considered an inherently dangerous object. They cite and rely heavily on a number of Illinois cases for the proposition that a property owner is not an insurer against every possibility of injury and cannot be compelled to indemnify for virtually any injury sustained by a child on the owner's property. Further, the Fitzpatricks argue that the ladder was not in and of itself an inherently dangerous object because the injury produced was not foreseeable.

What appears to be overlooked by the Fitzpatricks is the fact that the ladder on which Shawn Wiegers was injured was not an ordinary ladder. Rather, the metal device had rough and sharp edges, thus distinguishing it from an ordinary ladder structure. Because of the condition of its edges, the structure herein involved was transformed from an innocuous instrument. Furthermore, the Fitzpatricks acknowledged on more than one occasion an appreciation for the danger that may be involved as is illustrated by the testimony at trial. Mr. Fitzpatrick testified that he kept the ladders on his back porch but on one occasion he noticed that one of the ladders was leaning on the back fence of his yard. He questioned his children as to what the ladder was doing there and his children told him they had used the ladder to climb over the fence. In response to questions at trial concerning this incident, the following colloquy took place on cross-examination:

"Q. And were you concerned about their use for climbing over the fence?

A. Yes.

Q. What was your concern about climbing over the fence?

A. Because of the—being these type of ladders that they are, that they could fall off of the ladder or they could fall on to the ladder and get hurt.

Q. Okay. And what did you tell them to do?

A. I made sure that they went out and got those ladders and put them back on the back porch.

Q. And did they?

A. Yes, they most certainly did.

Q. And did you tell them to leave the ladders on the back porch?

A. I told them I don't want you using those ladders for anything except if I tell you to use them."

Mr. Fitzpatrick also testified to the following by way of deposition, which was introduced at trial:

"Q. Did you realize or did you know that the ladder could be dangerous for children to climb on?

A. The ladder could be danger, but I never—you know, the reason I didn't want them climbing over the fence on it, because I knew they could fall on the fence, on the ladder, whatever kids will do.

Q. Did the ladder have sharp edges?

A. Not sharp but just roughly cut off.

Q. They had been cut off by a torch of some sort, hadn't they?

**130**

A. I don't know if it was a torch. I don't know if they were hacksawed. I don't know.

Q. So it would be fair to say that if they were climbing on the ladder, you would perceive it as being dangerous to the children?

A. Possibly.

Q. Okay. So it would be equally as dangerous if it was just lying flat on the ground if they fell on one of those edges, right?

A. Possibly."

Further, Shawn's mother testified that when she arrived at the hospital after the incident, Mrs. Fitzpatrick "came up and put her arms around me and told me she was very sorry, that she had told her husband—she was afraid something like this was going to happen, she had asked him to get it out of the yard because she knew kids played on it."

Research has revealed no case turning on the same set of facts as those in the case at bar. Each case must necessarily turn on its own peculiar set of facts and therefore makes analogizing difficult, excepting only insofar as the case sets forth the rules of law regarding § 339.

■ Contrary to the Fitzpatricks assertion, there was sufficient evidence from which a submissible case was made and from which the jury could find in favor of Shawn Wiegers, that is, viewing the evidence in the light most favorable to Wiegers. Clearly, the record indicates that the Fitzpatricks appreciated the danger presented by these ladders and appreciated they were dangerous to children. Therefore, the requirement of § 339(b), regarding foreseeability was sufficiently shown so as to overcome a motion for directed verdict. Point I is denied.

In point II, the Fitzpatricks take issue with the following instruction which is premised on MAI 22.01:

### INSTRUCTION NO. 9

Your verdict must be for plaintiff Shawn Wiegers if you believe:

First, defendants maintained a metal device in the form of a ladder, and

Second, defendants knew or had reason to know children would be exposed to it, and

Third, defendants knew or should have known it presented an unreasonable risk of harm to children exposed to it, and

Fourth, plaintiff Shawn Wiegers, because of his youth, did not appreciate the risk of harm associated with it, and

Fifth, defendant failed to prevent plaintiff Shawn Wiegers from being exposed to such harm, and

Sixth, defendant was thereby negligent, and

Seventh, as a direct result of such negligence, plaintiff Shawn Wiegers was injured.

The Fitzpatricks argue that the description of the metal ladder as "a metal device in the form of a ladder" was prejudicially argumentative and should have simply been referred to as a ladder.

■ This argument ignores the fact that the jury was given ample opportunity to formulate a description in their own minds through the evidence presented at trial. Photographs of the ladder structure were shown to the jurors as well as testimony presented as to witnesses' observations and descriptions. Thus, the jury could not have been mislead even assuming the description was erroneous and therefore, the instruction did not create a substantial defect sufficient to warrant a reversal herein.

Because no error is found to exist in the trial court's denial of the motions for directed verdict and judgment notwithstanding the verdict, the judgment for plaintiffs is affirmed.

All concur.