Vickie MERRICK and Norval Merrick, Appellants,

v.

SOUTHWEST ELECTRIC COOPERATIVE, Kenny H. DeGraffenreid and Lowell E. Cobb, Jr., Respondents.

No. 17284.

Missouri Court of Appeals, Southern District, Division One.

Sept. 9, 1991.

James E. Corbett, John O. Newman, Ramsdell & Corbett, Springfield, for appellants.

David W. Ansley, James B. Condry, Hall, Ansley, Carmichael & Gardner, Springfield, for respondents.

CROW, Judge.

Plaintiffs Vickie Lee Merrick and Norval Merrick sued Southwest Electric Cooperative ("Southwest") and two of its officers, Kenny H. DeGraffenreid and Lowell E. Cobb, Jr., for the wrongful death of plaintiffs' son, Jody Allen Merrick. On motion of the three defendants, the trial court entered summary judgment in their favor per Rule 74.04, Missouri Rules of Civil Procedure (1990). Plaintiffs appeal.

The trial court evidently mined the facts from some depositions and exhibits. The record on appeal consists of five depositions (comprising some 380 pages), some pleadings, and a few exhibits. We sift these sources for evidence most favorable to plaintiffs, the parties against whom summary judgment was entered. *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241, 243–44[5] (Mo. banc 1984). Our narrative of the facts is penned in that light.

The fatality occurred October 6, 1986. On that date, Jody, age 18, was residing with his parents on a 375–acre farm in Polk County known as "the Hanson farm." A gravel road runs east and west through the farm. Eighty to ninety acres of the farm lie north of the road; the remainder of the farm lies south of it.

An electric line owned by Southwest runs east and west along the south side of the road. Plaintiffs refer to this line as "the main line."

On the day of the fatality, Jody was repairing a "flood gate" in a fence across a creek on the farm. He told his father he needed a piece of wire to finish the job and he knew of "some wire laying by the old rock house."

The rock house, described as an abandoned "old farm house," sits on the north side of the gravel road, about three-quarters of a mile from the creek where Jody was working.

A utility pole referred to as "the meter pole" is situated east of the rock house. Another utility pole, referred to as "the dead end pole," stands 16 feet east of the meter pole. The dead end pole is 35 feet long. Six feet are embedded in the ground, leaving 29 feet above the surface.

An energized line ("the phase wire") owned by Southwest runs from a "junction pole" in the main line north to the dead end pole. The phase wire is connected to the dead end pole near the top. A neutral wire also runs from the junction pole to the dead end pole, terminating on that pole approximately three feet beneath the phase wire. In earlier years, when electricity had been provided to the rock house, a transformer had been located on the dead end pole. The transformer had energized a three-wire service line running west from the dead end pole to the meter pole. From there, the service line evidently continued on to the rock house. The transformer had been removed from the dead end pole years before the day of the fatality. As a result, the service line from the dead end pole to the meter pole was not energized. However, the phase wire from the junction pole

to the dead end pole carried 7,200 volts. It was not insulated.

Another abandoned structure, referred to as "the summer house," sits approximately 100 yards south of the road in a southeasterly direction from the rock house. A "field light" is situated some 50 feet west of the summer house.

An energized line carrying 7,200 volts extends from the junction pole south to a pole west of the summer house, supplying electricity for the field light at that location.

Jody did not arrive home when expected, so his parents commenced a search. Norval found Jody's lifeless body approximately "two feet, two and a half feet" northeast of the dead end pole east of the rock house.

Jody owned a pair of "pole climbers" given him by |his grandfather, who had once owned a tree trimming service. Jody was wearing the climbers when his body was found. A pair of pliers lay nearby.

Norval observed "burn marks" on Jody's body. They were on the right little finger, right forearm, right shoulder, right inner thigh, and left foot.

Southwest officials inspected the site the following day (October 7, 1986). One of them, Mark Stanek, observed "fresh hook marks" extending up the dead end pole "maybe 10, 12 feet" from the ground. He saw no such marks above the 12–foot level. However, he noticed hook marks in a tree, the base of which was some six feet east of the dead end pole.

Stanek discovered a "burn mark" on a guy wire attached to the dead end pole. As best we can determine from the materials furnished us, that wire is fastened to the dead end pole some 18 inches beneath the top of the pole, on the opposite side from the phase wire and the neutral wire. The point of attachment of the guy wire is below the point of attachment of the phase wire, and above the point of attachment of the neutral wire.

Stanek saw a "little arc" or "bright spot" on the phase wire. A photograph supplied us appears to show this mark was within two feet of the point where the phase wire

is attached to the dead end pole. Stanek found some damp "mud or dirt on the neutral wire." It appears from the photograph that the dirt was almost directly beneath the arc mark on the phase wire.

Stanek testified that limbs of the tree on which he had seen hook marks were "pretty close" to the wires attached to the dead end pole; however, no limb rested on the wires. Stanek observed no burn mark on any limb.

One of Southwest's officials who inspected the site concluded Jody climbed the dead end pole, stood on the neutral wire, and made contact with the phase wire while his hand was on the guy wire. This "would form the perfect ground."

During Stanek's deposition, the following dialogue occurred:

"Q Now I'm going to ask you ... if ... the hook marks only went up the pole 10 to 12 feet, do you have any idea how Jody Merrick got on the neutral wire?

. . . .

A Apparently someone had started up the pole, came back down and then went up the tree and somehow climbed across."

The first of plaintiffs' two points relied on avers the trial court erred in granting summary judgment for defendants in that there was ample evidence to support a finding defendants were negligent.

■ In considering the point, we begin with the proposition that while a supplier of electricity is not an insurer of everyone's safety, the supplier is required to exercise the highest degree of care to prevent injury it can reasonably anticipate. *Lebow v. Missouri Public Service Co.*, 270 S.W.2d 713, 715[2] (Mo.1954); *Gnau v. Union Electric Co.*, 672 S.W.2d 142, 146[4] (Mo.App.1984).

Plaintiffs direct us to *Gladden v. Missouri Public Service Co.*, 277 S.W.2d 510 (Mo.1955), where an adult climbed a tree to capture a tame parakeet that had escaped from its cage. According to the adult, he was attempting to coax the bird to his hand when he inadvertently touched an electric

line and was injured. The Supreme Court of Missouri said:

"We think that the exercise of the highest degree of care also requires trimming around highly charged wires to isolate them so as to lessen the opportunity of persons to come in contact with them, wherever their presence may reasonably be expected. While the tree in this case was not a nut or fruit tree (in which the reason to anticipate persons would be greater), nevertheless we do not think we can hold as a matter of law that there was no reasonable basis to anticipate that an adult would be likely to be in a tree situated as this one was. On the contrary, we think this was a jury question.... It was not a difficult tree to climb and it had not been trimmed for 2½ years. It was on a much traveled highway in a populous area. The pictures show branches very close to the wires. We hold there was substantial evidence of failure to exercise the highest degree of care." *Id.* at 515.

Plaintiffs emphasize one of Southwest's officials testified Southwest liked to maintain a distance of 15 feet between its phase wires and tree limbs. In the instant case, the base of the tree in which the hook marks were discovered is approximately six feet from the dead end pole. Additionally, Stanek testified some trees (presumably including the one with the hook marks) near the dead end pole needed to be "side trimmed a little bit." Asked why, Stanek replied, "They was pretty close to the phase, to the wires."

One of Southwest's officials who inspected the site testified that if a Southwest crew had been there to do any work prior to the fatality, "[W]e probably would have trimmed the trees." However, said the official, "[I]t hadn't been noticed by service crews or obviously people going by that it would be recognized as a problem."

Another Southwest official testified all Southwest linemen are expected to report any location where they observe trees growing into Southwest's lines.

Plaintiffs maintain the above evidence demonstrates defendants recognized the necessity of keeping tree limbs away from uninsulated lines, and that the limbs near the phase wire on the dead end pole were too close.

Plaintiffs assert it is a jury question whether defendants should have foreseen an adult would be in the tree near the dead end pole. Plaintiffs insist defendants should have anticipated someone was likely to climb the tree to (a) top it out for firewood, (b) use it for a deer stand, (c) retrieve old equipment of Southwest's that appeared abandoned, and (d) experience the enjoyment of climbing.

Plaintiffs underscore the following testimony of one of Southwest's officials:

"Q Did the site of the occurrence including the wires, pole, the conductors, guy, all the items that make up the equipment that was there that time ... in your opinion was it in a safe condition?

A Well, I would have liked to have seen it in better condition than what it was.

Q What would you have liked to see improved?

A Well, the only thing that I would have liked to have seen improved was I don't like to have a tree even close to the line, and that's the only thing I would have wanted to have got rid of it.

. . . .

Q And why would you want to take the tree away from the line?

A Well, because some day that tree will be a big tree and get over into the phase wire and neutral and cause an outage.

Q Are you also concerned that somebody may climb that tree and touch a wire?

A Well, that can happen too, you know, a little kid that didn't know anything could."

Plaintiffs acknowledge the site of the fatality is a rural area. However, they say that was also true in *Mrad v. Missouri Edison Co.*, 649 S.W.2d 936 (Mo.App.1983), where an electrical injury was sustained at a pole near the boundary of a summer camp for children. The area around the

pole was "filled with brush, scrub trees and sticker bushes." *Id.* at 938. The opinion explained:

"To satisfy the duty to isolate, where it did not insulate, [the utility], in the exercise of the highest degree of care, must have located its wire where it would not injure persons in places where the utility corporation might reasonably expect them to lawfully be. [Citation omitted.]

. . . .

The test of foreseeability of injury in these cases is whether, in the exercise of the highest degree of care, the electric company reasonably could have anticipated that some injury was likely to have occurred to one lawfully near its transmission line. [Citation omitted.]

While the courts of this state have not seen fit to clothe the activities of electrical generating corporations with strict liability, where the question of foreseeability has been raised the courts have usually held the question to be one for the jury." [Citations omitted.] *Id.* at 941.

Defendants[1] proclaim it was unforeseeable to them "as a matter of law that [Jody] would use his own pole climbers to put himself in a position to come into contact with a phase line." Defendants emphasize the obvious: so long as Jody remained on the ground beneath the phase wire (suspended 29 feet above the earth), he was in no danger of electrocution. Defendants continue, "It was only when he trespassed on the pole using his own pole climbers and climbed, in combination with the pole and tree, to reach the three-bolt connector on the guy wire which he attempted to disconnect, that he placed himself in close proximity to the 7,200–volt phase line." Defendants assert there is no evidence they were on notice that individuals using pole climbers had climbed Southwest's poles intent upon taking guy wires.

While the evidence is susceptible to an inference Jody intended to take the guy wire, the evidence does not compel that conclusion. One of the photographs supplied us appears to show at least one, and perhaps two, wires attached to the dead end pole at right angles to the phase wire and neutral wire (and at right angles to the guy wire which, as reported earlier, is attached to the pole on the opposite side from the phase and neutral wires). The unidentified wire (or wires) referred to at the start of the preceding sentence may have been the de-energized line between the dead end pole and the meter pole. If Jody intended to take wire, we are unconvinced a jury would automatically conclude his objective was the guy wire. It is arguable Jody would have realized the guy wire was needed to support the dead end pole against the weight of the phase wire and neutral wire attached to the opposite side, and he would have assumed the old service line for the rock house was de-energized (which it was) and abandoned. If Jody intended to take wire—a reasonable assumption—and made his way to the top of the dead end pole in pursuit of that objective, one could reasonably infer he (a) meant to take one or more of the wires between the dead end pole and the meter pole, and (b) was electrocuted while attempting to get in position to detach them.

Defendants solemnly tell us the closest case they can find is *Donovan v. Union Electric Co.*, 454 S.W.2d 623 (Mo.App. 1970). There, a motion by an electric utility for judgment in accordance with its motion for a directed verdict at the close of all the evidence was sustained, and the ruling was upheld on appeal. *Id.* at 625. We see little similarity between *Donovan* and the case before us. In *Donovan*, a delivery truck driver was injured when a 30–foot boom he was using to unload cargo came in contact with an uninsulated electric wire 20 feet above the ground. The only thing *Donovan* and the instant case have in common is that both occurred in rural areas.

Defendants say the phase wire in the instant case was more isolated than the line in *Donovan* in that here there was no road

---

**1.** Defendants DeGraffenreid and Cobb assert no additional or different exculpatory theories than defendant Southwest.

leading to the dead end pole and it had to be reached by foot. Defendants exaggerate the evidence.

One of Southwest's officials testified the distance between the junction pole and the dead end pole is 89 feet. The junction pole, it will be recalled, is situated south of the road, while the dead end pole sits north of the road. Although the width of the road is not shown, it appears from a diagram prepared by the official that the dead end pole is no more than 60 feet, if that, from the north edge of the road. Furthermore, Norval testified Jody took an automobile when he departed for the rock house. Consequently, there is evidence Jody drove to within 60 feet of the dead end pole, perhaps even closer.

Furthermore, the recipient of the cargo in *Donovan* maintained a functioning office at the delivery site. Hence, it is arguable an observer would have been more likely to infer the line in *Donovan* was energized than in the instant case, where the rock house was obviously abandoned and there was no other structure to receive electricity from the dead end pole.

Defendants argue Jody could not have reasonably assumed the phase wire attached to the dead end pole was de-energized. Defendants point out the phase wire ran south from the dead end pole to the junction pole south of the road, thence south to the pole west of the summer house, providing electricity for the field light there. Defendants direct our attention to testimony by Norval that the field light was visible from plaintiffs' home and could be seen illuminated at night.

While this evidence demonstrates the phase wire from the junction pole to the pole west of the summer house was energized, we reject defendants' contention that anyone aware of this would inevitably assume the phase wire from the junction pole to the dead end pole was energized. One of Southwest's officials testified the distance from the junction pole to the pole west of the summer house is approximately 350 to 400 feet. As noted earlier, the pole west of the summer house lies *south* of the junction pole. The dead end pole where

Jody's body was found is 89 feet *north* of the junction pole. Therefore, the junction pole stands between the pole west of the summer house and the dead end pole, and the distance between the latter two poles is somewhere between 439 and 489 feet. We are unpersuaded someone who knew the field light west of the summer house was illuminated at night would automatically assume the phase wire between the junction pole and the dead end pole was energized.

Defendants strenuously argue they could not reasonably foresee a trespasser would climb a pole to remove Southwest's wire. Defendants say to hold otherwise would make them an insurer for unlawful activity.

Plaintiffs respond by asserting it is arguable Jody could have reasonably assumed the wires attached to the dead end pole were de-energized and any wire he intended to take was abandoned property. The rock house had been unoccupied for years. A photograph of it shows it was uninhabitable. There were trees and brush around the dead end pole, and the transformer had been removed. These circumstances, say plaintiffs, created an impression of abandonment.

■ Summary judgment is a drastic remedy bordering on denial of due process; consequently, great caution must be exercised in its use. *Olson v. Auto Owners Insurance Co.*, 700 S.W.2d 882, 884[1] (Mo. App.1985); *Miller v. United Security Insurance Co.*, 496 S.W.2d 871, 875[2] (Mo. App.1973); *Kroger Co. v. Roy Crosby Co.*, 393 S.W.2d 843, 844[1] (Mo.App.1965). Summary judgment is appropriate only when no theory within the scope of the pleadings, depositions, admissions and affidavits would permit recovery and the moving party is entitled to judgment as a matter of law. *Zafft*, 676 S.W.2d at 243–44[4].

■ Applying these principles, we hold that while a jury may agree with defendants' position on the foreseeability issue, we cannot declare as a matter of law that defendants could not have reasonably foreseen someone was likely to come into con-

tact with the phase wire on the dead end pole. To impose liability, it is unnecessary that defendants should have anticipated the exact injury which did occur or the exact manner in which it occurred. *Lebow*, 270 S.W.2d at 715[2].

The instant case is not one where a climber ascended a utility pole that carried wire to other poles on either side in a continuous line. Such a line would obviously be energized. Here, the phase wire attached to the dead end pole ended there (presumably accounting for the "dead end" characterization). There was no transformer on the dead end pole, and the only structure that ever received electricity from that pole had been abandoned for years. Although the record is not as illustrative as it should be, it is inferable there were no wires from the meter pole to the rock house. Furthermore, as noted earlier, there were trees and brush surrounding the dead end pole. Inasmuch as suppliers of electricity generally attempt to keep such vegetation away from active lines, an observer could arguably infer the wires attached to the dead end pole were de-energized (which was true of the old service line from the dead end pole to the meter pole).

Given these circumstances, we hold it is a jury question whether defendants, in the exercise of the highest degree of care, could have reasonably anticipated some injury was likely to occur to someone who reasonably believed he could lawfully ascend, and did ascend, the dead end pole by means of the nearby tree. Defendants are therefore not entitled to judgment in their favor as a matter of law.

Having reached this conclusion, we need not consider plaintiffs' second point.

The judgment is reversed and the cause is remanded.

PREWITT, P.J., and PARRISH, J., concur.