Richard W. **BALKE** and Ruth **Balke**, Respondents,

v.

**CENTRAL MISSOURI ELECTRIC COOPERATIVE, Appellant.**

**No. WD 54559.**

Missouri Court of Appeals, Western District.

Dec. 23, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 27, 1998.

Application for Transfer Sustained Feb. 24, 1998.

Case Retransferred May 26, 1998.

Court of Appeals Opinion Readopted June 2, 1998.

J. Christopher Spangler, Sedalia, for Appellant.

G. Spencer Miller, Kansas City, for Respondents.

Before SPINDEN, P.J., and LAURA DENVIR STITH and EDWIN H. SMITH, JJ.

EDWIN H. SMITH, Judge.

Central Missouri Electric Cooperative appeals from the judgment of the Circuit Court of Cooper County, following a jury trial, awarding $783,333 to its electrical customers Richard W. Balke and Ruth Balke, respondents, on their claim for property and business damages arising from an alleged overvoltage caused by appellant's defective electrical transformer.

Appellant asserts seven points on appeal. It alleges that the trial court erred: (1) in failing to grant its motion for judgment notwithstanding the verdict (JNOV) in that the applicable five-year statute of limitations had run on respondents' claim; (2) in allowing respondents' trial counsel to argue in closing argument an adverse inference arising from appellant's decision not to call an engineer retained by it as an expert witness; (3) in alternatively submitting respondents' claim on a defective product-strict (hereinafter DP–S) liability theory in that there is no authority in Missouri for such a submission as to a supplier of electricity; (4) in denying appellant's request that the jury be instructed as to the respondents' comparative fault as to their DP–S liability submission; (5) in alternatively submitting respondents' claim on a *res ipsa loquitur* theory; (6) by refusing to include in respondents' comparative fault verdict director as to their *res ipsa loquitur* submission the issue of their failure to mitigate damages; and (7) in failing to grant appellant's motion for a mistrial or, in the alternative, for a continuance, based upon the absence at trial of respondent, Richard W. Balke.

We reverse and remand.

### Facts

Central Missouri Electric Cooperative, appellant, is in the business of supplying electricity to the members of its cooperative. Although appellant sells electricity to its members, it does not generate the electricity; rather, it acquires the electricity from Central Missouri Power of Jefferson City, Mis-

souri. However, all of the equipment from the substation up to the customer's meter is owned by and maintained exclusively by appellant.

Appellant's distribution system of the electricity included a regulator, which served the function of regulating the voltage on the line to points down line or further away from the substation. The regulator would either increase or decrease the voltage depending on the circumstance. If the regulator sensed that the voltage at that point was either too high or too low, based upon the parameters of the system, then there was a 45–second to one-minute delay before the regulator was activated. On the regulator there was a device to record the number of times it was activated.

The voltage on any particular electrical supply line would vary depending on a variety of conditions. These conditions included the potential variations associated with the output from the substation, seasonal load variants, daily load variations and load variations caused by usage of particular customers. If a customer received voltages that were higher than the design parameters of the transmission system, the customer could experience motors overheating, motors burning out, and light bulbs burning out. Appellant had design parameters for their customers to receive no greater than 130 volts on the low side of the system and 260 volts on the high side of the system. The output of voltage from a line could be tested at the point of the transformer.

A transformer is a piece of electrical equipment which is designed to change the voltage which is received by the transformer from an electrical source. The transformer is designed to reduce the voltage from the distribution line down to a level that can be used by the customer to operate electrical equipment and devices in a residence or on a farm. The distribution line which began at the substation and continued to the respondents' property was energized with an average of 7,620 volts. The purpose for having a line with such a high voltage when a residence requires significantly less is that since the source of the electrical power is some distance from the ultimate consumer and the

voltage will decrease with the distance traveled over a line due to resistance, a higher voltage is used on the line so that, in theory, all customers on a particular line will have sufficient voltage.

The actual flow of electricity through a line is measured in amps. The work that is done by the electricity is measured in watts, and the formula to determine watts is simply the volts times amps. The amount of electricity which is purchased by a customer is measured at the customer's meter in kilowatts.

A transformer reduces the voltage received from an electrical source by means of internal windings. These windings are wrapped around a metal core with a high side and a low side. The output of volts from the transformer is based upon an established ratio for both the high and low sides. It will vary based upon the input. If there is a higher input into the transformer from the distribution line because of load variations, then there is a corresponding variation based upon the specific ratio for the transformer. It was well known in the electrical distribution field that a lightning strike could cause some of the windings or turns in a transformer to be shorted out and, as a result, the turns ratio would be altered.

Respondents began their dairy operation in 1972. They initially started with a herd of 30 dairy cows. The dairy operation grew in size from 30 cows to 200 cows between 1983 and 1991. The operation included state of the art computer technology, including a computer feeder system that was designed to provide each cow with a customized diet to enable it to produce the maximum amount of milk possible. The respondents' operation was one of the first dairy operations to utilize the computer feeder technology. In addition, they worked with their feed supplier to obtain the best quality of diet for their herd. The testimony was that a good dairy cow would produce 60 pounds of milk per day, and that respondents had cows that produced up to 120 pounds per day.

In 1982, the transformer servicing the respondents' farm was changed by the appellant because of increased electrical usage by them. The new transformer which was in-

stalled on the respondents' property had earlier been part of a bank of three transformers at another location. When the transformer was removed from its prior location, it was not checked to determine whether it was in good working order. When it was installed on the respondents' farm, the records from the appellant do not reflect that its output voltage was checked. However, employees of the appellant stated that it was normal practice to check the voltage on a transformer that was installed at a new location. The appellant had maintenance forms concerning the installation of transformers which had a specific blank for voltage information to be recorded, which was not completed on the form concerning the installation of the new transformer on respondents' farm.

Following the installation of the new transformer, the respondents began experiencing electrical problems before which they had not experienced. On April 15, 1983, a few months after the installation of the new transformer, Stan Nienhueser, a trained technician who was employed by the company who serviced respondents' equipment, made a service call to the respondents' farm and was concerned that "something just was not right." On April 19, 1983, Mr. Nienhueser spoke to a representative of the appellant about his concerns in regard to the electrical problems on the respondents' farm. He also made a subsequent telephone contact with the appellant again and expressed his concerns. In early 1984, there was a fire in respondents' milk barn. It started during the early morning hours. During the night, there was equipment which operated to keep the milk cool. There was testimony that this equipment was on at the time of the fire.

Appellant had no system for recording customer complaints. However, office personnel of appellant did remember Mr. Balke being in the office for complaints, but did not recall on how many occasions. The appellant did have records indicating that there were complaints from respondents which were classified as high bill complaints on at least three occasions. In response to the respondents' high bill complaints of record made in 1984, 1987 and 1990, an employee of the appellant went to the farm and found some electrical devices running that might have caused the bills to be higher at the times of the 1984 and 1987 complaints. In this respect, the manager for the appellant acknowledged that it was possible to determine whether the equipment that its employee found running, assuming that it was running continually, could have accounted for respondents' high electrical bills, but he admitted that that determination was not done. The manager could think of no explanation for the higher electric bill in 1990.

In regard to the respondents' dairy herd, there was evidence that their cows developed an increased frequency of mastitis, an inflammation of a cow's udder, after 1982. Most dairy farms have some mastitis, but the mastitis on respondents' farm got worse as time passed and ultimately forced them to sell their entire dairy herd in the early part of 1993. In addition, hundreds of cows died between 1983 and 1991 from the mastitis. There was testimony that high-bred dairy cows are very sensitive and that irregular and inconsistent milking will exacerbate mastitis.

In their petition, the respondents pled five theories as bases for their claim of property and business damages: (1) *res ipsa loquitur*, (2) DP–S liability, (3) negligence, (4) breach of implied warranty, and (5) fraudulent misrepresentation. Over the objection of appellant, the trial court submitted respondents' claim on two alternative theories of recovery: (1) DP–S liability; and, (2) *res ipsa loquitur*. As to respondents' *res ipsa loquitur* submission, the trial court submitted a comparative fault instruction, premised upon respondents' failure to advise or sufficiently advise appellant of conditions indicating over-voltage, but denied appellant's request that the respondents' failure to mitigate their damages be submitted as part of their comparative fault instruction. As to respondents' DP–S liability submission, the trial court denied appellant's request to submit a comparative fault instruction. The case having been submitted on the alternative theories of DP–S liability and *res ipsa loquitur*, the jury found in favor of respondents on both submissions. The jury determined the respondents to be 33%

at fault as to the *res ipsa loquitur* submission and assessed total damages of $783,333. Not unexpectedly, the respondents elected to accept the verdict based on DP–S liability. Accordingly, the trial court entered judgment for respondents in the amount of $783,333.

Post-trial, appellant filed a motion for JNOV or new trial, or in the alternative, to amend the judgment. Appellant's post-trial motions were denied.

This appeal follows.

## I.

■ In Point I, the appellant claims that the trial court erred in failing to grant its motion for JNOV in that respondents' claim for property and business damages was barred by the applicable statute of limitations, § 516.120. We disagree.

■ Our standard of review as to the denial of a motion for JNOV is essentially the same as that for the denial of a motion for a directed verdict. *Missouri Highway and Transp. Comm'n v. Kansas City Cold Storage, Inc.*, 948 S.W.2d 679, 685 (Mo.App. 1997) (citing *Norris v. Jones*, 687 S.W.2d 280, 281 (Mo.App.1985)). JNOV for the defendant is only appropriate if the plaintiff fails to make a submissible case. *Jungerman v. City of Raytown*, 925 S.W.2d 202, 204 (Mo. banc 1996). In reviewing for a submissible case, we must accept all evidence and reasonable inferences favorable to the verdict, disregarding contrary evidence. *Missouri Highway and Transp. Comm'n*, 948 S.W.2d at 685 (citing *Bayne v. Jenkins*, 593 S.W.2d 519, 521 (Mo. banc 1980)). A motion for JNOV should only be granted when there is no room for reasonable minds to differ as to the ultimate disposition of the case. *Missouri Highway and Transp. Comm'n*, 948 S.W.2d at 685 (citing *Wiegers v. Fitzpatrick*, 766 S.W.2d 126, 128 (Mo.App.1989)).

■ Any "action for taking, detaining or injuring any goods or chattels, including actions for the recovery of specific personal property, or for any other injury to the person or rights of another, not arising on contract" falls within the five-year statute of

limitations. § 516.120.4.[1] The cause of action accrues "when the damage ... is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained." § 516.100. "Capable of ascertainment" has been interpreted to mean the fact of damage, rather than the precise amount. *Earls v. King*, 785 S.W.2d 741, 744 (Mo.App.1990) (citations omitted). "The statute of limitations begins to run when damage is capable of ascertainment, even though the amount of damage is not yet fully ascertainable." *Id.* However, in cases where there is a "continuing wrong" the law as to when the statute of limitations begins to run and bars a claim has been tempered by the Supreme Court of Missouri in *Davis v. Laclede*, 603 S.W.2d 554 (Mo.1980).

■ In *Davis*, the court held that the statute of limitations did not bar the plaintiff from recovering damages which were sustained within the five-year statutory period immediately preceding the filing of the suit, although his damages were caused by a wrong which did not occur during the statutory period in question. *Id.* at 556. In doing so, the court stated:

> [I]f the wrong done is of such a character that it may be said that all of the damages, past and future, are capable of ascertainment in a single action so that the entire damage accrues in the first instance, the statute of limitation begins to run from that time. If, on the other hand, the wrong may be said to continue from day to day, and to create a fresh injury from day to day, and the wrong is capable of being terminated, a right of action exists for the damages suffered within the statutory period immediately preceding suit.

*Id.* In other words, where there is a continuing wrong, the statute of limitations does not work as a complete time-bar of a claim, but only works to bar those damages which accrued prior to the statutory period in question. Thus, the issue for us to decide here, as to the running of the statute of limitations, is whether the alleged wrong here was a "continuing wrong" which caused respon-

1. All statutory references are to RSMo 1994, unless otherwise indicated.

dents fresh and separate items of damage from day to day.

The claimed wrong here is appellant's alleged failure due to a defective transformer to provide a proper supply of electricity to respondents. Respondents alleged in their petition that this wrong continued from day to day and could have been terminated if appellant had detected the defective transformer in question and replaced it. As to damages, respondents alleged that the defective transformer caused the interruption of their dairy operation, causing inconsistencies in the milking process and resulting in mastitis in their dairy cows. They further alleged that this outbreak of mastitis forced them to sell their entire herd, thereby destroying what was a profitable enterprise. They further alleged that the defective transformer resulted in higher electrical bills and damaged electrical equipment of the dairy operation, as well as household electrical appliances.

Under the foregoing circumstances, applying the rule of *Davis,* we find that the alleged defective electrical transformer constituted a continuing wrong which created fresh injuries to respondents from day to day. Therefore, the five-year statute of limitations would work only to time-bar those damages sustained by respondents which occurred more than five years prior to the commencement of their action. Since respondents filed their petition on July 7, 1992, the statute of limitations would not have time-barred their claim except to the extent they sought to recover damages which accrued prior to July 7, 1987. The issue then we must determine is whether respondents were allowed to proceed to the jury on damages which were time-barred by § 516.120 in that they had accrued more than five years prior to the commencement of respondents' lawsuit.

After reviewing the record as to respondents' damages, we find that the jury was instructed in Instruction 11 to "determine total amount of [respondents'] damages to be such sum as will fairly and justly compensate [them] for any damages [the jury] believe[s] they sustained *after July 7, 1987.* ..." (emphasis added). Thus, the only damages of respondents which were submitted to the

jury for its consideration were those which had accrued within the five years preceding the commencement of the action. As such, we find that those damages were not time-barred by the statute of limitations, and the trial court did not err in overruling appellant's motion for JNOV on the basis of the running of the statute of limitations.

Point denied.

We will next address appellant's Points III and V dealing with its claims that the trial court erred in submitting respondents' claim for damages on the alternative theories of DP–S liability and *res ipsa loquitur,* in that, depending on their dispositions, Points II, IV, VI and VII would be rendered moot.

## II.

One of the grounds alleged in appellant's motion for JNOV was that the trial court erred in submitting to the jury respondents' claim for property and business damages on a DP–S liability theory because there is no authority in Missouri for the proposition that a supplier or distributor of electricity can be held strictly liable for damages caused a customer from supplying electricity in a defective manner. Appellant continues this argument on appeal in its Point III by claiming that the trial court erred in overruling its motion for JNOV on this basis. We agree.

Since our review of this point is based on whether appellant's motion for JNOV was properly denied, we will use the standard of review for the denial of a motion for JNOV set out in our discussion of Point I, *supra.*

At trial, appellant specifically objected to the giving of Instruction No. 7, respondents' DP–S liability verdict director, in that Missouri law did not recognize such a submission as to the supply or distribution of electricity. In order to preserve a specific objection at trial to the submission of a jury instruction, the appellant must include a general statement in its motion for new trial of any allegations of instructional error. *Lohmann v. Norfolk & Western Ry. Co.,* 948 S.W.2d 659, 667 (Mo.App.1997); Rule 78.07. In this respect, appellant's motion for new trial alleged "[t]he court erred in giving Instruction No. 7, the product liability/defect verdict directing

instruction, for the reason that there is no law in the State of Missouri which holds a supplier of electricity can be liable under a product/liability [sic] defect theory." Instruction No. 7 stated:

## Instruction No. 7

On the claim of plaintiffs Richard Wayne Balke and Ruth Balke for damage to their property and business based on product defect, your verdict must be for plaintiffs against defendant if you believe:

First, defendant Central Missouri Electric Cooperative sold electricity in the course of defendant's business; and

Second, the electricity was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and

Third, the electricity was used in a manner reasonably anticipated, and

Fourth, such defective condition directly caused or directly contributed to cause damage to plaintiffs.

Thus, the issue for us to decide in this point is whether a supplier or distributor of electricity can be held strictly liable for damages caused by supplying electricity to a customer in a defective manner.

Missouri, like most jurisdictions, has adopted strict liability for defective product tort claims as found in the RESTATEMENT (SECOND) OF TORTS § 402A. *Keener v. Dayton Elec. Mfr. Co.*, 445 S.W.2d 362, 364 (Mo. 1969). It provides, in pertinent part:

(1) One who sells any product in a defective condition reasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

RESTATEMENT (SECOND) OF TORTS § 402A. The issue of whether a supplier of electricity can be held strictly liable in tort under § 402A appears to be one of first impression in Missouri. *See Hills v. Ozark Border Elec. Co-op.*, 710 S.W.2d 338, 339 (Mo.App.1986). Consequently, we look to other jurisdictions which have addressed this issue for guidance.

### A. Jurisdictions Imposing Strict Liability

Where jurisdictions have found § 402A tort liability for the defective supply of electricity, the Wisconsin Supreme Court's reasoning in *Ransome v. Wisconsin Elec. Power Co.*, 87 Wis.2d 605, 275 N.W.2d 641 (1979), is frequently relied upon.[2] In reviewing the cases, we find the reasoning in *Ransome* to be representative of the reasoning relied on by those jurisdictions holding that a supplier of electricity is subject to § 402A tort liability.

In *Ransome*, the court held that:

[electricity] is a form of energy that can be made or produced by men, confined, controlled, transmitted and distributed to be used as an energy source for heat, power and light and is distributed in the stream of commerce. The distribution might well be a service, but the electricity itself, in the contemplation of the ordinary user, is a consumable product.

*Id.* at 643. Having found that electricity was a product for the purpose of § 402A liability, the court then noted that "[s]trict liability does not make the manufacturer or seller an insurer nor does it impose absolute liability" and "certain defenses are available to the manufacturer or seller." *Id.* at 646–47.

In analyzing the issue presented, the court also addressed implicated, public policy considerations. In examining public policy con-

---

2. For example, *see Mancuso v. Southern California Edison Co.*, 232 Cal.App.3d 88, 283 Cal.Rptr. 300, 307 (2 Dist.1991); *Smith v. Home Light and Power Co.*, 734 P.2d 1051, 1054 (Colo.1987); *Monroe v. Savannah Elec. and Power Co.*, 219 Ga.App. 460, 465 S.E.2d 508, 509 (1995); *Elgin Airport Inn, Inc. v. Commonwealth Edison Co.*, 88 Ill.App.3d 477, 43 Ill.Dec. 620, 623, 410 N.E.2d 620, 623 (1980); *Aversa v. Public Service Elec. and Gas Co.*, 186 N.J.Super. 130, 451 A.2d 976, 979 (1982); *Kaplan v. Cablevision of Pa., Inc.*, 448 Pa.Super. 306, 671 A.2d 716 (1996); *Hernandez v. George E. Failing Co.*, 28 Wash.App. 548, 624 P.2d 749, 750 (1981).

siderations, the court found that such considerations

> weigh heavily in favor of the consumer.... Consumer self-protection from the defective and unreasonably dangerous product, namely, electricity of an excessively high voltage, is not feasible in the case of the ordinary consumer. Abstention from use of the product is unrealistic; electric power supplied by a sole electric company is generally the sole source of electricity. In addition, the seller here is in a better position to anticipate, protect against and eliminate possible dangerous electricity overloads of this type. Finally, the seller can more easily absorb or spread or insure against any financial losses which result. Public policy considerations do not preclude the imposition of liability in this case.

*Id.* at 650.

## B. Jurisdictions Not Imposing Strict Liability

Of the jurisdictions which have held that the supply of electricity is not subject to § 402A strict liability, the Ohio Supreme Court's reasoning in *Otte v. Dayton Power & Light Co.*, 37 Ohio St.3d 33, 523 N.E.2d 835 (1988), is most often cited.[3] We find the reasoning in *Otte* to be representative of the reasoning relied on in those jurisdictions holding that a supplier of electricity is not subject to § 402A strict liability.

In rejecting the theory of DP–S liability, the Supreme Court of Ohio in *Otte* relied on three rationales: (1) electricity is not a product within the meaning of § 402A; (2) existing law already held suppliers of electricity to the highest degree of care which appropriately addressed the very dangerous activity of supplying electricity; and (3) public policy ramifications did not justify the imposition of strict liability on suppliers of electricity. *Id.* at 838. We will discuss each of these rationales separately.

### 1. Electricity Not a § 402A Product

The court in *Otte* first recognized that, by its terms, § 402A of the RESTATEMENT (SECOND) OF TORTS applies only to the sale of a product in a defective condition, not a service, and that "[a] 'product' is anything made by human industry or art." *Otte*, 523 N.E.2d at 838. With this as a given, the court held that electricity is not a product for purposes of § 402A. *Id.* In *Otte*, the plaintiffs were alleging a purported defect in the distribution system, which the court viewed as a service, not a product. *Id.* In *Otte*, the plaintiffs "attempted to equate the process of creating and delivering electricity to the manufacturing and sale of an ordinary consumer product." *Id.* The court reasoned that electricity does not fall within the § 402A definition of a product because "electricity is the flow of electrically charged particles along a conductor" and a supplier of electricity "does not manufacture electrically charged particles, but rather, only sets in motion the necessary elements that allow the flow of electricity," which constitutes supplying a service, not manufacturing a product. *Id.* The court further reasoned that electricity consumers do not pay for individual electrically charged particles; rather, they pay for each kilowatt hour provided and are charged for the length of time electricity flows through the electrical system of the supplier or distributor. In other words, the consumer pays for a service, not a product. *Id* at 839.

While discussing whether electricity was a product for purposes of imposing § 402A DP–S liability, the court also noted that § 402A liability requires that the product be "expected to and does reach the user or consumer without substantial change in the condition in which it is sold." RESTATEMENT (SECOND) OF TORTS § 402A(1)(b). As such, the *Otte* court recognized that electricity which is generated and released at the power plant is considerably higher in voltage than that which is expected to reach the consumer. Therefore, it held that the requirement for § 402A liability that the product not undergo a substantial change en route from the

**3.** For example, *see Bowen v. Niagara Mohawk Power Corp.*, 183 A.D.2d 293, 590 N.Y.S.2d 628, 631 (N.Y.A.D. 4 Dept.1992); *G & K Dairy v. Princeton Elec. Plant Bd.*, 781 F.Supp. 485, 489 (W.D.Ky.1991); *ZumBerge v. Northern States Power Co.*, 481 N.W.2d 103, 108 (Minn.App. 1992); *Wyrulec Co. v. Schutt*, 866 P.2d 756, 760 (Wyo.1993).

manufacturer to consumer is not satisfied in the case of supplying electricity. *Id.*

## 2. Highest Degree of Care Already Imposed

As a further basis for its holding in *Otte,* the Supreme Court of Ohio noted that Ohio law already held suppliers of electricity to the highest degree of care consistent with the practical operation of such a business. *Otte,* 523 N.E.2d at 840 (citations omitted). As such, the court noted that Ohio had already recognized that the delivery of electricity can be a very dangerous activity and had articulated a standard of care commensurate with that danger. *Id.* at 841.

## 3. Public Policy Does Not Require Imposition of Strict Liability

The *Otte* court also discussed public policy as a rationale for imposing strict liability on a supplier of electricity based on risk-allocation as discussed by California Supreme Court Justice Roger J. Traynor in his concurring opinion in *Escola v. Coca Cola Bottling Co. of Fresno,* 24 Cal.2d 453, 150 P.2d 436 (1944). *Otte,* 523 N.E.2d at 841. There, Justice Traynor stated:

> The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business.

*Id.* The *Otte* court opined that, although strict liability may serve as an impetus for manufacturers in certain businesses to create a safer product, it found that such risk-allocation is not applicable to a highly regulated public utility such as an electrical utility. "Generally speaking, the risk-allocation policy is applicable only when the industry affected may pass on its costs to the general public." *Id.*

> [S]hifting the burden of proof in a products liability action to relieve the plaintiff of the burden of proving fault lacks force when applied to a highly regulated public utility. Although application of strict liability provides a strong impetus for manufacturers to create safer products and is a cogent

and meaningful justification, we must again point out that the public utility does not operate in a free market. Safety regulations are imposed upon it by the [National Electric Safety Code]. It is doubtful whether the imposition of strict liability would lead to a safer distribution system. *Id.* at 841–42.

## C. Missouri

Although the issue of whether a supplier of electricity can be held strictly liable in tort is one of first impression in Missouri, two separate concurring opinions in *Hills v. Ozark Border Elec. Co-op.* did speak to the issue. *Hills,* 710 S.W.2d at 342–45. The majority opinion in *Hills* found it unnecessary to address the issue of whether strict liability in tort applied to a supplier of electricity; however, Judges Prewitt and Maus each spoke on the issue in their separate concurring opinions. *Id.* We find their discussion enlightening as to both sides of the issue.

Judge Prewitt recognized that suppliers of electricity are "not insurers of the safety of persons, but that their liability is determined by principles of negligence." *Id.* at 343. He recognized that "[d]istributing electricity is different from distributing most other commodities" and "[a]pplying strict liability in tort to a seller of electricity seems harsher than to the seller of a product where the seller can more easily prevent alterations to its products before they are sold." *Id.* Nevertheless, he indicated if the issue was squarely presented, he would hold that a supplier of electricity could be held strictly liable "if electricity leaves the company's system and enters its customer's electrical system in a dangerous and unanticipated condition." *Id.* Contrary to Judge Prewitt, Judge Maus wrote that he was "of the opinion [that] the sale of electricity upon passing through a distribution system ... is not the sale of a 'product' within the meaning of 2 Restatement, Law of Torts, Second, § 402A (1965)," in that once electricity leaves the power plant, it is no longer within the control of the seller. *Id.* at 344–45. Thus, he reasoned that although electricity is a product, its distribution is a service. *Id.* at 345 (citations omitted).

After carefully examining the arguments in favor of and against imposing § 402A liability on a supplier of electricity, we are persuaded by the reasoning advanced in *Otte* and Judge Maus' concurring opinion in *Hills*. As to the three rationales discussed in *Otte*, we first note that, like Ohio, Missouri courts have repeatedly held that a supplier of electricity is already required to exercise the highest degree of care to prevent injury. *See, for example, Mobley v. Webster Elec. Co-op.,* 859 S.W.2d 923, 926 (Mo.App.1993); *Merrick v. Southwest Elec. Co-op.,* 815 S.W.2d 118 (Mo. App.1991). Given this standard, we are not aware of an alarming rise in the number of cases in this state where a supplier of electricity has failed to provide electricity in a reasonably safe manner which would warrant the existing standard of liability being changed. As to public policy considerations, after examining arguments on both sides of the issue, we are not persuaded by either argument. Both are equally persuasive. Finally, as to the remaining rationale of *Otte*, this court is persuaded by the argument that although electricity itself may be a product, its distribution or supply is a service purchased by a consumer, not a product as required by § 402A(1)(a) to impose DP–S liability.

Further, as noted by the *Otte* court, to impose § 402A DP–S liability, a product must not undergo any substantial change before it reaches the consumer. *Latham v. Wal–Mart Stores, Inc.,* 818 S.W.2d 673, 675–76 (Mo.App.1991) (holding that although a product under § 402A need not be manufactured, its nature must be fixed when it leaves the seller's control and it must not undergo substantial change before it reaches the consumer). In this respect, given the characteristics of electricity, we do not believe that its nature is fixed when it leaves the power plant's control nor does it reach the consumer without undergoing substantial change. The electricity which is generated and released at the power plant is considerably higher in voltage than that which is expected to reach the consumer, and as a result, undergoes a substantial change in form before entering the consumer's home.

For the foregoing reasons, we hold that a supplier or distributor of electricity cannot be held strictly liable in tort under § 402A of RESTATEMENT (SECOND) OF TORTS for failing to deliver electricity in a reasonably safe manner. Thus, the trial court here erred in failing to grant appellant's motion for JNOV on this basis.

### III.

In appellant's fifth point, it argues that the trial court erred in denying its motion for new trial in that respondents should not have been allowed to submit their claim for property and business damages on a *res ipsa loquitur* theory. We agree.

The denial of a motion for new trial is reviewed for an abuse of discretion. *Kansas City v. Keene Corp.,* 855 S.W.2d 360 (Mo.banc 1993). In order for the trial court to grant a motion for new trial, the error complained of as a basis for the motion must be prejudicial to the party seeking the new trial. *VonSande v. VonSande,* 858 S.W.2d 233, 236 (Mo.App.1993).

At trial, appellant specifically objected to the giving of respondents' Instruction No. 8, which submitted their claim on the theory of *res ipsa loquitur,* in that the respondents had pled and introduced evidence of specific acts of negligence by appellant. Instruction No. 8 stated:

Instruction No. 8

On the claim of plaintiffs, Richard Wayne Balke and Ruth Balke, for damage to their property and business based on negligence, you must assess a percentage of fault to defendant Central Missouri Electric Cooperative whether or not plaintiffs were partly at fault if you believe:

First, defendant Central Missouri Electric Cooperative owned, controlled and operated electrical equipment which supplied electricity to plaintiff Richard Wayne Balke's and Ruth Balke's property, and

Second, the electrical equipment was owned, controlled and operated by defendant Central Missouri Electric Cooperative supplied electricity to plaintiffs' property

at levels capable of damaging plaintiffs' property when put to its normal uses, and

Third, from the facts in evidence and the reasonable inferences therefrom, you find that the levels of electricity were the direct result of defendant Central Missouri Electric Cooperative's negligence, and

Fourth, such negligence directly caused or directly contributed to cause damage to plaintiffs Richard Wayne Balke and Ruth Balke.

In its motion for new trial, the appellant generally objected on this same basis, as required to preserve the allegation of error for appellate review. *Lohmann,* 948 S.W.2d at 667; Rule 78.07. Appellant continues this argument on appeal in its Point V by claiming that the trial court erred in overruling its motion for new trial on this same basis.

The doctrine of *res ipsa loquitur* permits the fact finder to infer negligence without proof of specific negligent conduct on the part of the defendant where: '(1) The incident resulted in an injury of the kind which ordinarily does not occur without someone's negligence; (2) the incident is caused by an instrumentality under the control of the defendant; and (3) the defendant has superior knowledge or means of information as to the cause of the incident.'

*Hale v. Am. Family Mut. Ins. Co.,* 927 S.W.2d 522, 525 (Mo.App.1996) (citing *Christie v. Ruffin,* 824 S.W.2d 534, 536 (Mo.App. 1992)). The theory of *"[r]es ipsa loquitur* is incompatible with proof of specific negligence." *Hale,* 927 S.W.2d at 525 (citing *Bonnot v. City of Jefferson City,* 791 S.W.2d 766, 769 (Mo.App.1990)). *Res ipsa loquitur* only aids a

party who does not know and therefore cannot plead or adduce proof showing the specific cause of or how the event which resulted in his injury occurred, but if he knows how it came to happen, and just what caused it, and either specifically pleads or proves the cause, there is neither room nor necessity for the presumption or inference which the rule affords.

*Id.* This is not the situation that existed in the instant case where the record is replete with allegations and proof by respondents as to specific acts of negligence by appellant.

The record here reflects that both parties' expert witnesses agreed that a lightning strike caused the damage to appellant's transformer, which in turn caused the over-voltage experienced by respondents. Therefore, it could not be inferred that the damage to the transformer was the fault of the appellant. Instead, the record would reflect that the damage was the result of an act of God. As a result, respondents' claim for property and business damages on a *res ipsa* theory was predicated on an inference that the property and business would not have been damaged by the defective transformer and resulting over-voltage unless the appellant negligently failed to detect the defect and remedy it.

A review of the record here indicates that, as appellant argues, the respondents alleged facts in their petition and introduced evidence at trial demonstrating that the appellant was negligent in that it "failed to monitor the electrical voltages on [respondents'] property or failed to carefully check the voltages after complaints about the high/over voltages when it knew or should have known of the detrimental and damaging effect...." Further, the appellant points out in its brief numerous examples of respondents adducing evidence at trial of specific ways in which appellant was negligent. For example, respondents adduced evidence that during the many times that appellant's employees were at the Balke farm, "almost none" of them checked the voltage, but assumed it was correct; and that appellant had equipment that could have recorded the voltage over a 24- or 48-hour period of time to see exactly what kind of voltage existed, but did not. Appellant also points out that during closing argument, respondents admitted that it was lightning that damaged the transformer and argued that appellant knew of the damage, but ignored their complaints. Appellant contends that all of this is consistent with specific negligence and inconsistent with the theory of *res ipsa loquitur.* We agree.

Although respondents pled and submitted their case on a *res ipsa loquitur* theory, they specifically pled, proved and argued facts as

to appellant's specific negligent acts which caused their damages alleged; as a result, they were not entitled to submit their claim on *res ipsa loquitur.* *Hale,* 927 S.W.2d at 525 (citing *Bonnot v. City of Jefferson City,* 791 S.W.2d 766, 769 (Mo.App.1990)). Thus, as appellant contends, the trial court erred by submitting respondents' claim to the jury on the theory of *res ipsa loquitur.*

Because our resolution of appellant's Point II, III, and V is dispositive of its appeal, we need not address its remaining points relied on.

## Conclusion

 Having found that the trial court erred in submitting respondents' claim on alternative theories of § 402A DP–S liability and *res ipsa loquitur,* we now must determine whether to simply reverse the trial court's judgment for respondents or reverse the judgment and remand the cause to the trial court for a new trial. In this regard,

> where a plaintiff has from the outset misconceived the law and has chosen a mistaken legal theory to submit to the jury for redress, we may reverse the judgment against the plaintiff and remand the cause to allow the plaintiff to plead and to submit another theory. We do so, however, where the evidence shows the plaintiff may recover upon another theory. And, we do so because the plaintiff's counsel has missed completely the appropriate theory. Simple fairness requires the plaintiff be given a meaningful day in court.
>
> We have also followed this procedure and reversed and remanded where a plaintiff has pleaded several legal theories, but chosen to submit the wrong one to the jury. But, again the procedure is followed because counsel's choice was based on mistake and not made to seek a tactical or strategic advantage.

*Blaine v. J.E. Jones Const. Co.,* 841 S.W.2d 703, 710 (Mo.App.1992).

Obviously, respondents' election to submit their case on the alternative theories of § 402A DP–S liability and *res ipsa loquitur* was based on their mistaken belief that § 402A liability was viable as to a supplier of electricity, such as the appellant. This was

not unreasonable given the fact this issue was a case of first impression in this state and the split in other jurisdictions addressing the issue. Had respondents had the benefit of knowing that we would reject liability here on a theory of § 402A DP–S liability, it is reasonable to infer that, given their options of submitting on *res ipsa loquitur* or specific negligence, they may well have chosen to submit on specific negligence. As such, because we hold that § 402A DP–S liability is not applicable under the circumstances here, we find that respondents have not had their meaningful day in court. And, because it appears from the record that respondents could make a submissible case on a theory of specific negligence, we reverse the judgment and remand the cause for a new trial.

All concur.